UNITED STATES of America
v.
W. A. BOYLE, Appellant.
No. 72-1749.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 2, 1973.

Decided July 16, 1973.

Certiorari Denied Dec. 3, 1973.
See 94 S.Ct. 593.

---

See also, D.C., 338 F.Supp. 1025.

E. Barrett Prettyman, Jr., Washington, D. C., with whom Peter F. Rousselot, Washington, D. C., was on the brief, for appellant.

Charles F. C. Ruff, Sp. Asst. Atty. Gen., Washington, D. C., with whom Thomas H. Henderson and Thomas L. Crowe, Attys., Dept. of Justice, were on the brief, for appellee.

Before McGOWAN, TAMM and WILKEY, Circuit Judges.

WILKEY, Circuit Judge:

Appellant W. A. Boyle is the former president of the United Mine Workers

of America. Convicted on thirteen counts as an officer of the UMW of having (1) consented to unlawful contributions of labor union funds to the campaigns of candidates for federal office,[1] (2) unlawfully converting union funds for the purpose of making such a contribution,[2] and (3) conspired with others to commit these two offenses,[3] appellant seeks reversal under a number of theories.[4] We conclude that appellant's conviction on all charges was proper and affirm the District Court.

## I. Facts

Labor's Non-Partisan League (League) was created in 1936 by the Congress of Industrial Organizations (CIO) to act as its legislative and lobbying arm. In 1940 the UMW left the

---

1. This charge was based on the provisions of 18 U.S.C. § 610 (1970), which at the time of the indictment in this case provided:

 It is unlawful for any national bank, or any corporation organized by authority of any law of Congress, to make a contribution or expenditure in connection with any election to any political office, or in connection with any primary election or political convention or caucus held to select candidates for any political office, or for any corporation whatever, or any labor organization to make a contribution or expenditure in connection with any election at which Presidential and Vice Presidential electors or a Senator or Representative in, or a Delegate or Resident Commissioner to Congress are to be voted for, or in connection with any primary election or political convention or caucus held to select candidates for any of the foregoing offices, or for any candidate, political committee, or other person to accept or receive any contribution prohibited by this section.

 Every corporation or labor organization which makes any contribution or expenditure in violation of this section shall be fined not more than $5,000; and every officer or director of any corporation, or officer of any labor organization, who consents to any contribution or expenditure by the corporation or labor organization, as the case may be, and any person who accepts or receives any contribution, in violation of this section, shall be fined not more than $1,000 or imprisoned not more than one year, or both; and if the violation was willful, shall be fined not more than $10,000 or imprisoned not more than two years, or both.

 For the purposes of this section "labor organization" means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exist for the purpose, in whole or in part, of dealing with employers concern-

ing grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work.

2. This charge was based on the provision of 29 U.S.C. § 501(c) (1970), which provides:

 Any person who embezzles, steals, *or unlawfully and willfully abstracts or converts* to his own use, or *the use of another*, any of the moneys, funds, securities, property, or other assets of a labor organization of which he is an officer, or by which he is employed, directly or indirectly, shall be fined not more than $10,000 or imprisoned for not more than five years, or both. (Emphasis added.)

3. This charge was based on the provisions of 18 U.S.C. § 371 (1970), which provides:

 If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

 If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor.

4. The full text of the thirteen-count indictment is set forth in the Joint Appendix at pp. 18–33. Count I of the indictment alleged that appellant and two other individuals conspired in violation of 18 U.S.C. § 371 (1970) to violate two federal statutes—18 U.S.C. § 610 (1970) and 29 U.S.C. § 501(c) (1970). Counts II through XII of the indictment charged appellant with eleven substantive violations of 18 U.S.C. § 610 (1970). Count XIII of the indictment charged appellant with a substantive violation of 29 U.S.C. § 501(c) (1970).

CIO to become a separate entity. At that time the League as originally constituted disbanded, only to be immediately reconstituted as the lobbying and information branch of the UMW alone.

In persons and in property the League and the UMW have been closely identified. Since 1940 the president of the League and the current president of the UMW have been one and the same. From the time of the separation in 1940 until the time of the indictment in this case the League received all but a small portion of its funds from the UMW's general treasury.[5]

In 1947 Congress passed legislation which prohibited some forms of political contributions by labor organizations to candidates for federal office.[6] Following the Act's passage the League made no more contributions to federal candidates until the mid-1960's.

In 1963 appellant Boyle became president of the UMW and automatically chairman of the League. In 1966 the UMW began again to be solicited for contributions by candidates for federal office, chiefly those who had recently discovered the "testimonial dinner" as a fountain of funds. Boyle knew of and authorized contributions which were made out of the League's treasury for this purpose, as the trial jury found.[7]

Robert Howe, director of the League for a part of the time in question, testified that he was concerned that contributions by the League might violate 18 U.S.C. § 610, which makes it "unlawful . . . for any labor organization to make a contribution" to a federal campaign. He testified that he and James Kmetz, another employee and Howe's successor as director, sought to hide the source of these funds by having checks on the League's account made out to cash, depositing the proceeds in their personal accounts, and then making the contributions with a personal check. The evidence is sufficient to permit a conclusion that Boyle knew and approved of this practice, that he knew of Howe's fears that the contributions were illegal, and that he knew and approved of efforts to conceal the source of the funds involved.

Monthly statements of these transactions were prepared. Appellant's executive secretary, Suzanne Richards, instructed that only one copy of this be sent to Boyle's office and that no copies be kept in the files of the League. Richards also instructed Howe to destroy any evidence that might incriminate Boyle or the UMW.

In the spring of 1969 the League's treasury was depleted. At the request of Kmetz, Boyle authorized a transfer of $5,000, which he characterized as a "loan," from the UMW treasury to the League. The jury concluded that this amount was actually transferred to facilitate the making of a political contribution by the League.[8] This transfer was ratified by the International Executive Board of the UMW over two years after the "loan" in question.

---

5. There is actually no evidence in the record that the League's funds came from any source other than the UMW general treasury. The Government, however, was unable to prove the origin of a relatively small portion of the League's funds during the period of 1942 to the time of the offenses in this case. Thus, we do not *know* that *all* of the League's funds came from the UMW treasury. Appellant attempts to make much of this inability to prove the source of this small portion of the League's funds. This inability is, however, irrelevant, as we shall illustrate in Part IIA, *ante.*

6. *See* footnote 1, *supra.*

7. We do not understand appellant to contest the sufficiency of the evidence to support these and other facts stated in this section of our opinion.

8. Count XIII of the indictment charged appellant with violating 29 U.S.C. § 501 (c) (1970), by transferring the $5,000 from the UMW to the League account. Count XII of the indictment charged appellant with violating 18 U.S.C. § 610 (1970) by authorizing this $5,000 to be used as a campaign contribution.

## II. *Legality of the Political Contributions*

As of the date of the indictment in this case, 18 U.S.C. § 610 (1970) provided in relevant part:

> It is unlawful for . . . any labor organization to make a contribution or expenditure in connection with . . . [a federal election].
>
> [E]very . . . officer of any labor organization, who consents to any contribution or expenditure by the . . . labor organization . . . in violation of this section, shall be . . . [fined and/or imprisoned].

The trial court found that the contributions described above constituted a violation of this Act, and that appellant Boyle was subject to fine and imprisonment for consenting to these contributions. Appellant contends that his conviction under this statute was invalid because: (A) the Government did not allege or show and the jury did not find that the funds contributed came from an "involuntary" source prohibited under the statute, and (B) the statute is an unconstitutional infringement on the union's freedom of speech.

### A. *The Need to Show an "Involuntary" Source.*

■ On its face § 610 requires that the Government establish five distinct elements in order to prove a violation. The Government must prove beyond a reasonable doubt that (1) a labor organization (2) made a contribution or expenditure (3) in connection with a specified federal election (4) for purposes of active electioneering and that (5) the defendant officer consented to the making of the contribution. Appellant does not contest that the jury was properly charged on these elements, nor that there was sufficient evidence to permit the jury to find that these elements had been proved.

Appellant contends, however, that an additional element must be established to support a guilty verdict under § 610. He argues that there is a violation if, and only if, money ultimately contributed to a political candidate was collected by that union or organization through payments "actually or effectively required for employment or union membership." [9] Such funds would, for example, be money collected from members in the form of dues or assessments and may be characterized as being given "involuntarily" to the union or affiliated organization in order for a person to remain a member of the union. Appellant contends that only contributions of such "involuntary" funds are forbidden, that the union is free to contribute any other funds it controls if those funds come from a "voluntary" source. Such a voluntary source, according to appellant, could be contributions by union members not required for membership or gifts to the union from outside sources.

Appellant's argument is based on language in the Supreme Court's decision in *Pipefitters v. United States*.[10] That decision held that not all political contributions by labor organizations are prohibited by § 610, but only those derived from funds which "were actually or effectively required for employment or union membership." [11] This additional element of the offense in *Pipefitters* was found by the Supreme Court not in the express language of the statute, but rather in the legislative history of the enactment. The opinion reversed the convictions because the "jury instructions failed to require proof of [this] essential element for conviction . . ." [12] Appellant argues that in Boyle's case, as in *Pipefitters*, the jury was not instructed and did not find that the contributions came from an "involuntary" source.

---

9. Appellant's brief at 14, quoting the Supreme Court's decision in Pipefitters v. United States, 407 U.S. 385 at 439, 92 S.Ct. 2247, 33 L.Ed.2d 11 (1972).

10. 407 U.S. 385, 92 S.Ct. 2247 (1972).

11. *Id.* at 439, 92 S.Ct. at 2276.

12. *Id.* at 436, 92 S.Ct. at 2275.

We believe, however, that appellant misconstrues the import of the language relied on in *Pipefitters*. The Court there repeatedly emphasized that its discussion dealt with a separate, segregated fund in which there was "strict segregation of its monies from union dues and assessments." [13] The *Pipefitters* fund was composed of contributions by union members that were not required for membership and which at least superficially did not appear to have been the product of a coercion. "Strict segregation," combined with the appearance that the funds were not coerced from union members, raised a presumption that the money contributed was derived from a "voluntary" source. Logically, when the union has taken the precautions necessary to make it appear that the funds were given voluntarily for use in political campaigns, the burden should be on the Government to prove the contrary.

In Boyle's case, though, contributions were made from funds derived from the general UMW treasury, which was composed predominantly of dues, assessments and other "involuntary" funds. The UMW made no effort to segregate dues and assessments from funds that might be legally contributed to political campaigns.

The legislative history of § 610 reveals Congress' primary concern that funds from a general union treasury not be available for federal political campaigns.[14] The Court in *Pipefitters* explicitly interpreted the section as being designed to prohibit expenditures from the "general union treasury." [15]

The clear intent of § 610, as evinced in the legislative history and interpreted by the Supreme Court, is to *permit* expenditures from separate, segregated funds if the contributions to it were, in truth, voluntary, and to *prohibit* expenditures from a union's general treasury.[16] If the Government proves that the source of the funds directed to a political contribution is the general union treasury, derived in part from dues and assessments, this is all that need be established on the question of voluntary or involuntary contributions.

This interpretation is the only one consistent with the policies underlying § 610. Appellant's contention, stripped of legalisms, is that the Government must show in all circumstances that the contributions *could not* have come from a "voluntary" source. Since the funds expended here were derived from the UMW general treasury, this reading would require the Government to determine the source of all funds that have flowed through the treasury during the period in question, and to prove that this amount (which could run into the hundreds of millions) could not have been derived from a voluntary source. This would place an insuperable burden on the Government; likewise, and even more perniciously contrary to the avowed objectives of the Act, it would also place a premium on poor bookkeeping by discouraging unions from maintaining complete records of revenue.

13. *Id.* at 414, 92 S.Ct. at 2264. For other references in the opinion to the need to keep political funds separate from the general union treasury, *see id.* at 401, 416, 417, 421 and 429, 92 S.Ct. 2247.

14. *See* the analysis in *Pipefitters, supra*, at 407–414 and 416–427, 92 S.Ct. 2247.

15. *Id.* at 414, 92 S.Ct. 2247.

16. If "voluntary" and "involuntary" funds are commingled and then a portion is expended for political purposes, it is impossible to tell whether the "voluntary" or the "involuntary" money is being expended. One can only assume that a proportionate share of each is being spent. Thus Congress in prohibiting expenditures from a union general treasury simply acted on the principle that expenditures from commingled funds will be presumed to consist of proportionate shares of the different types of money. For this reason it was irrelevant that the Government was unable to show the source of a small portion of the money in the League treasury. A substantial, or huge, portion of the money in the League treasury was "involuntary" at the time of the contribution. This "involuntary" portion may be presumed to be a part of each expenditure from the commingled funds.

The resulting difficulty in tracing the sources of union contributions would make § 610 virtually useless.

In *Pipefitters* the Court held that solicitation of contributions for the segregated political fund "must be conducted under circumstances plainly indicating that donations are for a political purpose and that those solicited may decline to contribute without loss of job, union membership, or any other reprisal within the union's institutional power." [17] There is no contention that there was ever a report to the UMW membership that any transfers were being made from the general UMW treasury to the League. In fact, evidence shows that steps were taken to conceal this. Appellant's argument on voluntariness thus is in first and last analysis an argument that "contributions" by UMW members were "voluntary" when the individual UMW member knew, and could have known, nothing about his own "contribution." Congress intended to protect individual union members against both overtly coerced and unknown contributions; each is equally involuntary.

Boyle's case, involving transfers from the UMW general treasury derived principally from dues, assessments, and other obligatory member contributions, is thus different from *Pipefitters*. Where there are *individual* contributions to a fund which is ostensibly set up as a separate "voluntary" affair, then there is a rational justification for requiring the Government to prove, and the jury appropriately to be so charged, that the contributions ultimately employed politically were involuntary. This the Supreme Court held in *Pipefitters*. But in Boyle's case the "contributions" to the separate fund, the League, were alleged to be a series of massive infusions from the UMW's general treasury, not a mul-

titude of contributions from individual members, as in *Pipefitters*. Boyle's evidence raised no issue of the "voluntariness" of individual members' contributions to the UMW general treasury; quite the contrary, dues, assessments and other obligatory payments were accepted as making up the individual members' contributions.

Hence a jury charge of the style found necessary in *Pipefitters* would have raised an issue of "voluntariness" of individual contributions that does not exist in Boyle's case; the undisputed evidence establishes the involuntary nature of the members' contributions to the UMW general treasury; the jury should never have been permitted to find that individual members authorized "voluntary" political contributions of which they knew nothing, and the jury was not so instructed.

The proper issue here, by which the Government was required to and did satisfy its burden of proof of involuntariness, was the source of the funds transferred into the League account. If this source was the UMW general treasury, its nature established the funds as involuntarily obtained from the UMW members; no subsequent legerdemain by an official or board of the UMW could make voluntary what had been involuntary in origin. Clearly, the indictment here alleged that the source of the contributions was the UMW general treasury.[18] Sufficient evidence was adduced at trial to permit the issue to reach the jury, and the jury was properly instructed that it must find that the contributions came from such funds.[19] The Government, consequently, established and the jury found all of the elements necessary to show a violation of § 610.

---

17. 407 U.S. at 414, 92 S.Ct. at 2264.

18. Joint App. at 3. As the Supreme Court said in *Pipefitters*: " . . . an indictment that alleges a contribution or expenditure from the general treasury of a union or corporation in connection with a federal election states an offense. *See*

nn. 47 and 48, *infra*. The unanimous vote of the union members or stockholders may at most (but we need not now decide) be a defense." 407 U.S. at 416 n. 28, 92 S.Ct. at 2265.

19. Joint App. at 177–78.

## B. *The Constitutionality of § 610*

 Appellant argues that even if *Pipefitters* does not compel reversal, the convictions under § 610 must be overturned because that statute imposes an unconstitutional limitation on the union's freedom of speech. He does not dispute that Congress may legitimately regulate federal campaign financing and that there must be valid reasons to limit spending by a union. Appellant contends, however, that the legitimate goals of the statute may be achieved in a manner that will not so substantially restrict the union's right to present its views by supporting candidates of its choice. If it is true that the legitimate goals of the statute may be achieved in a less restrictive manner, the statute is overbroad. Even when a compelling interest exists, if the statute protects that interest by a needless infringement of First Amendment rights, it must be struck down.[20]

Appellant seeks to invoke this principle by pointing to one purpose of § 610, to assure the purity of the federal electoral process by preventing undue influence by labor unions who might use the aggregated wealth of their general treasuries in federal elections. He then contends that this goal may be achieved less restrictively by limiting the maximum amounts which could be contributed by unions, rather than by banning contributions entirely. This misapprehends the scope and scheme of § 610. That provision, as interpreted in *Pipefitters*, only prohibits contributions from monies which are not strictly segregated from union dues and assessments.[21] Appellant's suggested alternative would actually be more restrictive than § 610; unions may now contribute *any amount* so long as it is from a proper source, while under appellant's suggestion the maximum would be limited.

Appellant then points to a second purpose of § 610, to assure that a dissent-ing union member is not *forced* to contribute, in the form of mandatory dues and assessments, to support political views with which he disagrees. Appellant contends that this admittedly justifiable goal of protecting minority interests could be protected less restrictively in one of two ways.

*First*, appellant asserts that minority interests are adequately protected by the "democratic" procedures under which a union must operate. It is argued that majority approval of political expenditures would somehow validate the unwanted burden placed upon dissenters. Democratic majority rule does not, in itself, necessarily protect minority interest. Indeed, it is based on the premise that the losing side (the minority) must accept the dictates of the winning side (the majority). Democracy in labor unions as elsewhere, without additional protection, does nothing more than hold forth the possibility that in time the minority may become the majority. By definition the protection of minority interests requires that the majority be restrained in exercising its will over the minority. If a union could expend "involuntary" funds upon the vote of a majority of its members, minority interests would not be protected—they would be rendered irrelevant.

*Second*, appellant argues that Congress could have protected minority rights by adopting the mechanism employed in Great Britain. This permits the refunding of a proportionate amount of a member's dues if the dissenter gives notice of his disagreement. Appellant argues that

> [l]egislation protecting the minority union member could be drawn to permit either of two forms: "contracting in," in which all members approving of the proposed political assessment would be required to give affirmative evidence of such approval, or "con-

20. *See, e. g.*, Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960). The issue of the statute's constitutionality was explicitly preserved in *Pipefitters, supra*, at 400, 92 S.Ct. 2247.

21. *See* text accompanying footnotes 10–12, *supra*.

tracting out," in which a union member objecting to the political use of a portion of his dues could refuse to tender that particular assessment.[22]

This argument ignores the fact that § 610, as interpreted in *Pipefitters*, does establish a system of "contracting in" just as appellant suggests. Unions are permitted to make contributions if assenting members "give affirmative evidence of such approval" by assenting to having a deduction made from the member's pay check.[23]

Assuming, only arguendo, that § 610 does restrict in some degree a union's otherwise unlimited right of free speech, appellant has failed to advance a less restrictive alternative to § 610 which will both prevent the use of a union's aggregate wealth in federal elections and protect union minority interests, and we have found elsewhere no such viable less restrictive alternative. We hold § 610 to be constitutional.

### III. The § 501 Conviction

 Appellant allegedly violated 29 U.S.C. § 501(c) (1970), which provides that

any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use, or the use of another, any of the moneys, funds, securities, property, or other assets of a labor organization of which he is an officer . . . [will be subject to fine or imprisonment].

The jury found that appellant violated this law by ordering the transfer of the $5,000 "loan" described above from the UMW general treasury to the League treasury with the knowledge and for the purpose of making a political contribution. Appellant does not contest that the transfer was a conversion of union funds to "the use of another." Rather, appellant argues that for two reasons this conversion was not unlawful.

*First*, relying on the Second Circuit's opinion in United States v. Silverman,[24] appellant argues that such a transfer violates § 501(c) only if the jury finds that (1) the conversion was made without a bona fide authorization by the union, or (2) that the union derived no benefit from the transfer. Appellant's reliance upon the *Silverman* rationale is misplaced. The *use* to which the money was converted in that case, support of a candidate for state office, was not unlawful. The court stressed that there was no legal bar to the use *if* the transfer was properly authorized by the union.[25]

Regardless of the validity of the Second Circuit's analysis in situations where the use is lawful, the holding in *Silverman* has no relevance here. In the instant case the use to which the money was converted could not have been lawful. As we have seen, the contribution of the $5,000 constituted a violation of § 610. Neither authorization by any union officer or body, nor any resulting benefit to the union, would have rendered lawful the transfer of general union funds to a federal political campaign. In *Pipefitters*[26] the Supreme Court specifically reserved the question whether even a *unanimous* vote of all union members could validate a union political contribution under § 610.

 Thus, approval or benefit cannot make the conversion to "the use of another" in this case any less unlawful. If the use to which the money is knowingly transferred is unlawful, then the transfer constitutes a violation of § 501(c). The jury was properly instructed that this was the applicable standard, that it had to find the appellant authorized the transfer knowingly for the

---

22. Appellant's Brief at 36.

23. *Ibid.*

24. 430 F.2d 106 (2d Cir. 1970), cert. denied, 402 U.S. 953, 91 S.Ct. 1619, 29 L.Ed.2d 123 (1971).

25. *Id.* at 112.

26. See quotation in n. 18, *supra.*

purpose of making indirectly a political contribution, and there was sufficient evidence to support its conclusion.[27]

*Second*, appellant seems to argue that § 501(c) was intended to punish union officials only if the jury finds that the officer did not have at the time a "bona fide belief in the legality of his action . . ."[28] The argument is that the statute is intended to punish only *knowingly* illegal or *ultra vires* expenditures, and that union officials will be granted great latitude in forming their bona fide beliefs as to whether an expenditure is within the legal objectives of the union organization. Under this reading, § 501(c) would never punish for a transfer, even if the official knew that the money was to be used for an unlawful purpose, if the official could have reasonably believed that the transfer was authorized under the union's constitution, bylaws, and procedure. Appellant contends that he was prejudiced by the court's refusal to permit him to argue as a defense that he believed the transfer was authorized.

This interpretation is founded upon passages in the Congressional debates on the statute in which individual Congressmen discussed, in general terms, the Labor-Management Reporting and Disclosure Act of 1959, of which § 501(c) is a small part.[29] The thrust of the dialogue relied upon is that the Act will not punish an officer for an expenditure

> [i]f it is made in accordance with, and for a purpose permitted by, the constitution, bylaws or regularly adopted resolutions of the union's constitutional governing bodies, the officer or employee will not be required at his peril to determine whether or not the constitution, bylaws or resolution goes beyond the legitimate purposes and objectives of the organization.[30]

The relevance of this language in this context is at best ambiguous, and the remarks by individual Congressmen made during a floor debate are not the most persuasive form of legislative history. We believe, in any case, that the remarks relied upon do not support appellant's reading of the statute. The passage simply says that a transfer will not be deemed unlawful merely because it is made for a purpose that is *ultra vires* what the court determines to be the legitimate functions of a union.

As we have noted, however, the transfer in this case was not for a purpose that was *ultra vires*, but rather for a purpose that was itself a crime. There is no hint in either the statute or its legislative history that indicates a Congressional intent to excuse from the ambit of § 501(c) transfers for a criminal purpose. No officer or union governing body could in all logic believe that a transfer for a criminal purpose was for a legitimate union purpose, was authorized by the union constitution or bylaws, or was for the union's benefit.

Appellant argues that our construction means that § 501(c) duplicates 18 U.S.C. § 610, which was discussed above. The argument is that Congress could not have intended to enact two statutes that punish officers for contributions to federal political campaigns, and hence § 501(c) must be construed as requiring something that is not required for a violation of § 610—specifically, knowledge that the act is unauthorized.

This argument fails, because the statutes as we construe them do not punish identical conduct. Section 610 punishes officers who "consent to" political contributions. Section 501(c) punishes, in this case, an officer who "abstracts or converts" union funds to use in a federal political campaign. The first statute is violated by an officer who simply knows

---

27. Joint App. at 184.

28. Appellant's Reply Brief at 10.

29. 105 Cong.Rec. 17900 (1959) (remarks of Senator Kennedy) ; 105 Cong.Rec. 15690 (1959) (remarks of Congressman O'Hara).

30. 105 Cong.Rec. 15690 (1959) (remarks of Congressman O'Hara).

of and acquiesces in the expenditure of union funds for a political campaign; the second requires some affirmative action to transfer union funds for this or any other unlawful purpose, and the unlawful objective may or may not have anything to do with prohibited union political contributions.

## IV. Conspiracy to Commit the Substantive Offenses

Count one of the indictment charged that appellant conspired with Owens, Kmetz, Richards and another alleged co-conspirator to commit the substantive acts of conversion and unlawful contributions to federal campaigns. Appellant does not contest that if the conversion and contribution were indeed unlawful, that there was sufficient evidence of a conspiracy to commit those crimes to permit the submission of the issue to the jury. Rather, he argues that the same proof was introduced to prove the conspiracy and the substantive counts, and that he was consequently convicted twice for the same offense in violation of the double jeopardy clause of the Fifth Amendment to the United States Constitution. Under this theory, the substantive and conspiracy counts would have merged into a single offense and the Government could not have proceeded under both. Appellant also suggests that while the conspiracy conviction may have been proper in a narrow technical sense, this court, under its general supervisory power over federal criminal trials, may set aside the conspiracy conviction as being somehow unfair or unjust.

### A. Double Jeopardy

■■■■■ "It is settled law in this country that the commission of a substantive offense and a conspiracy to commit it are separate and distinct crimes, and a plea of double jeopardy is no defense to a conviction for both. See Pinkerton v. United States, 328 U.S. 640, 643–644 [66 S.Ct. 1180, 90 L.Ed. 1489], and cases cited therein. Only if the substantive offense and the conspiracy are identical does a conviction for both constitute double jeopardy." [31] It is also irrelevant that the "overt acts charged in the conspiracy counts were also charged and proved as substantive offenses." [32] This general rule is based on the fact that

> a combination of persons to commit a wrong, either as an end or as a means to an end, is so much more dangerous because of its increased power to do wrong, because it is more difficult to guard against and prevent the evil designs of a group of persons than of a single person, and because of the terror which fear of such a combination tends to create in the minds of people.[33]

■■■■ Appellant argues that since the same proof was introduced to prove both the conspiracy and substantive offenses, there is an identity of offenses requiring a merger. The issue, however, does not turn on the identity of evidence actually produced but on whether the same evidence is *required* to prove the two offenses. In this case, the requirements for conviction under the conspiracy count were the agreement between Boyle and at least one co-conspirator and the doing of at least one overt act (not necessarily making the contribution) in furtherance of that agreement. Consummation, or success, of the conspiracy was unnecessary. In order to convict under any of the substantive counts, the crime must have been completed—*i. e.*, the contribution actually made. It is also clear that appellant could have been convicted on the substantive counts without prov-

31. Pereira v. United States, 347 U.S. 1, at 11, 74 S.Ct. 358, at 364, 98 L.Ed. 435 (1954).

32. Pinkerton v. United States, 328 U.S. 640, at 644, 66 S.Ct. 1180, at 1182, 90 L.Ed. 1489 (1946).

33. Dennis v. United States, 341 U.S. 494, 573, 71 S.Ct. 857, 899, 95 L.Ed. 1137 (1951) (Justice Jackson concurring), citing from Miller on Criminal Law, 110; see, e. g., United States v. Rabinowich, 238 U.S. 78, 88, 35 S.Ct. 682, 59 L.Ed. 1211 (1915); Pinkerton v. United States, 328 U.S. 640, 643–644, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946).

ing an agreement between himself and the co-conspirators charged in Count I. Therefore, § 610 and the conspiracy statute do not punish the same thing.[34]

■ There is, however, an exception for situations in which the conspiracy to commit a crime produces no additional danger to society. If the statute defining the substantive offense requires concerted action and none participated other than the necessary parties, there is no additional danger and a charge of conspiracy to violate the statute will not lie:

> There are, of course, instances where a conspiracy charge may not be added to the substantive charge. One is where the agreement of two persons is necessary for the completion of the substantive crime and there is no ingredient in the conspiracy which is not present in the completed crime. See United States v. Katz, 271 U.S. 354, 355–356 [46 S.Ct. 513, 70 L.Ed. 986]; Gebardi v. United States, 287 U.S. 112, 121-122 [53 S.Ct. 35, 77 L. Ed. 206].[35]

Taking these principles as established, it is clear that both statutes here involved, 18 U.S.C. § 610 and 29 U.S.C. § 501(c), may be violated without necessarily involving any concerted effort of the alleged co-conspirators in this case. While § 610 arguably might require the concert of both a union officer who consents to a political contribution and a candidate who receives the contribution, yet the conspiracy to violate § 610 as charged here involved more than these two statutorily necessary parties; other union officers and employees in addition to appellant were involved in the conspiracy. Section 501(c), likewise, did not require the concert of the parties to this conspiracy. That statute may be

violated by a union officer acting alone who "willfully abstracts or converts" union funds. Consequently the conspiracy to violate these statutes charged here does not fit within the narrow exception described above, but rather is governed by the principles set forth in Pereira v. United States, supra.

Appellant attempts to confuse the issue by arguing that on the facts of this case all of the alleged co-conspirators were required as a practical matter in order to violate §§ 501(c) and 610. For example, appellant states that he could not have drawn the checks on the League account without the endorsing signature of one of the co-conspirators; this co-conspirator is therefore argued to be "necessary" for the completion of the offense in this case.[36] The practical test of what is necessary under given circumstances is not the decisive test; the critical factor is that this co-conspirator was not required to exist by the statute as an element of the offense. He was only "necessary" in the sense that a skillful getaway driver may be "necessary" to a successful bank robbery; he may have made the crime easier to commit, but he was not a necessary element of the crime as it is described in the statute. A participant is "necessary" to the commission of a crime, for purposes of merging substantive and conspiracy counts, if the substantive statute requires the person's existence as an abstract legal element of the crime. Here that is simply not the case.

### B. The Court's Supervisory Power

■ Appellant argues that this court should exercise its "supervisory power over federal criminal trials"[37] and overturn his conviction for conspir-

---

34. Cf. Pereira v. United States, supra, 347 U.S. at 11–12, 74 S.Ct. 358. See Woods v. United States, 99 U.S.App.D.C. 351, 240 F.2d 37, cert. denied, 353 U.S. 941, 77 S.Ct. 815, 1 L.Ed.2d 760 (1958).

35. Pinkerton v. United States, 328 U.S. 640, 643, 66 S.Ct. 1180, 1182, 90 L.Ed. 1489 (1946).

36. This co-conspirator was not "necessary" to the offense since appellant could have simply forged the signature of the co-signer of the check. At best, appellant's argument is that he would have had to commit the crime of forgery in order to complete the crime of contribution without the co-conspirator.

37. Appellant's Brief at 47.

acy. This argument is based essentially on the contention that the use of conspiracy offenses may be subject to abuse in the hands of zealous prosecutors, who may allege conspiracy in an effort to gain tactical advantages, *e. g.*, otherwise irrelevant evidence admitted. Appellant does not argue on this point that the conspiracy conviction was rendered in violation of currently applicable legal standards.

In effect appellant is asking this court to change the law of conspiracy—because the current law is unfair or bad policy. He cites no authority compelling this limitation and does not suggest a standard which we might adopt for determining when a conspiracy conviction might be allowed.[38] He simply asks that we ignore the fact that his conviction is lawful under Supreme Court authority and reverse the trial court. Precedent, prudence, and modesty compel us to decline.[39]

## V. *Conclusion*

For the foregoing reasons, all convictions are

Affirmed.

---

38. Appellant refers to Judge Ely's concurring opinion in the decision in United States v. Vaught, 434 F.2d 124 (9th Cir. 1970), as support for his argument. A reading of Judge Ely's brief comments makes it clear that he did not feel that the sort of relief requested here is possible under existing law. He is, rather, expressing a desire that such a change in the law be made at a future time. *Id.* at 125.

39. *See* cases cited in footnotes 30–33, *supra.*