**FEDERAL ELECTION COMMISSION,
Plaintiff,**

v.

**NATIONAL EDUCATION ASSOCIA-
TION et al., Defendants.**

Civ. A. No. 77–1705.

United States District Court,
District of Columbia.

July 20, 1978.

Kenneth A. Gross, Washington, D. C., for plaintiff.

Robert H. Chanin, Washington, D. C., for defendants.

## MEMORANDUM

GASCH, District Judge.

### I. *Background.*

This suit is brought under the Federal Election Campaign Act of 1971, *as amend-* ed, 2 U.S.C. §§ 431–455 (1976). Plaintiff, the Federal Election Commission (FEC), is charged with the responsibility of enforcing the Act.[1] Pursuant to that responsibility, it contends that defendant National Education Association (NEA) and seventeen of its state affiliates[2] have violated the Act by using an illegal system for collecting contributions to finance its political activities.

The NEA is an organization whose members are professional educators employed by school systems throughout the United States. The NEA and its affiliates have a "unified membership," meaning that a person must belong to the local, state, and national associations in order to belong to any one of them. Membership is voluntary, however, so one need not become a member in order to maintain employment.

The National Education Association Political Action Committee (NEA–PAC) is a separate organization created by the NEA in 1972 to receive contributions from NEA members and to make expenditures in connection with federal elections. The amount of each member's desired contribution is set at $1.00 annually, and it is paid at the same time as the annual membership dues are paid.

Most NEA members choose to pay their annual dues in monthly installments using automatic payroll deduction. In 1973 the NEA's Representative Assembly, consisting of approximately 10,000 elected delegates, voted to adopt the payroll deduction method as the most efficient means of funding NEA–PAC as well. The method of implementation chosen, and the subject of this controversy, is the "reverse check-off." Under that system, when a teacher signs his NEA membership application, he thereby automatically agrees not only to a deduction of dues, but also to a deduction of the additional $1.00 political contribution. If the NEA member does not want to make that dollar contribution, he must submit a

---

1. 2 U.S.C. §§ 437c(b)(1), 437d(a)(6), 437g (1976).

2. The seventeen state education associations are: California, Connecticut, Idaho, Illinois, Kansas, Kentucky, Massachusetts, Michigan, Nebraska, Nevada, New Hampshire, Pennsylvania, Rhode Island, South Dakota, Vermont, Wisconsin, and Wyoming.

separate written request for a refund rather than being able to disallow its deduction in the first place.

In addition to the payroll deduction method, some local affiliates also allowed dues to be paid by cash or check. NEA members who use either of these latter two methods apparently do not have to make the dollar contribution and then seek a refund.

The FEC has received complaints concerning use of the reverse check-off procedure, generally alleging that the system forced individuals to make political contributions, or that it caused contributions to be made unknowingly, or that the refund system was too cumbersome to be viable. After investigation, the FEC notified the NEA in March, 1977, that it found reasonable cause to believe that reverse check-off violated section 441b(b)(3)(A) of the statute, which prohibits financing political funds by "dues, fees, or other moneys required as a condition of membership in a labor organization." [3]

The parties entered into conciliation efforts aimed at resolving this dispute, and from the NEA's perspective, aimed at securing approval of the future use of reverse check-off. These efforts failed, however. In the interim, the FEC issued its new regulations, one of which provides that fees "paid as a condition of membership" remain so "even though they are refundable." [4]

The NEA then requested an advisory opinion from the FEC, presenting to it variations of the reverse check-off and seeking approval of them.[5] While that request was pending, the FEC filed this suit seeking a ruling that defendants' use of reverse check-off violates the Act, an order requiring the return of all funds collected pursuant to that method,[6] an injunction against future use of reverse check-off, and assessment of a civil penalty.[7] Defendants have counterclaimed, essentially asking that the reverse check-off or the variations of it submitted to the FEC for advisory opinion be declared legal under the Act, or if not legal, that the Act and its regulations be declared unconstitutional. Subsequently, the FEC issued its advisory opinion rejecting all of defendants' proposals but one, and rendering no opinion as to it.

Now before the Court are the parties' cross-motions for summary judgment. For the reasons set forth below, it is the Court's conclusion that plaintiff's motion should be granted and defendants' denied.

II. *Plaintiff's Motion for Summary Judgment.*

The FEC's motion for summary judgment rests upon alternative arguments: first, that reverse check-off is per se illegal because it inherently results in involuntary contributions; secondly, that even if not a per se violation as implemented by defendants, it is illegal either because it does not inform the members of the refund right or because the refund mechanism is so cumbersome as to make it ineffective. The principal legal pillars supporting plaintiff's arguments are the Supreme Court's decision in *Pipefitters Local 562 v. United States,* 407 U.S. 385, 92 S.Ct. 2247, 33 L.Ed.2d 11 (1972), and this circuit's decision in *United States v. Boyle,* 157 U.S.App.D.C. 166, 482 F.2d 755, *cert. denied,* 414 U.S. 1076, 94 S.Ct. 593, 38 L.Ed.2d 483 (1973).

*Pipefitters* involved a conviction under 18 U.S.C. § 610 (1970), which made it illegal for "any labor organization to make a contribution or expenditure in connection with

---

**3.** 2 U.S.C. § 441b(b)(3)(A) (1976).

**4.** 11 C.F.R. § 114.5(a)(1) (1977).

**5.** The Act provides that the FEC may issue an advisory opinion regarding a special factual situation and further provides that anyone relying in good faith upon such an opinion may not be subjected to any sanction provided by the Act. 2 U.S.C. § 437f (1976).

**6.** Defendants have placed in escrow $383,-843.82 representing the monies collected through reverse check-off during the 1976–77 membership year.

**7.** Upon finding a violation, the Court has authority to assess a penalty not to "exceed the greater of $5,000 or an amount equal to the amount of any contribution . . . involved." 2 U.S.C. § 437g(a)(5)(C) (1976).

[a federal election]." After the Supreme Court had heard oral argument, the Federal Election Campaign Act of 1971 was passed, amending section 610 by adding the language now contained in section 441b(b)(3)(A), the provision at issue in this case.[8] Insofar as is pertinent here, the Court held that the Act merely codified existing law and further, that not all political contributions by labor organizations were prohibited, only those derived from funds that "were actually or effectively required for employment or union membership." *Id.* at 399, 439, 92 S.Ct. at 2256, 2276.

The funds at issue in *Pipefitters* were raised by contributions and kept strictly segregated from the union's general treasury, which was financed by assessed dues. *Id.* at 414, 92 S.Ct. at 2264. The Court therefore concluded that reversible error had occurred because the jury was not instructed to determine whether the contributions to that segregated fund were voluntary or whether they were involuntary because required or effectively assessed. *Id.* at 435–38, 92 S.Ct. at 2274, 2275. To be voluntary the contribution must result from a "knowing free-choice," which means that the solicitation must be

> conducted under circumstances plainly indicating donations are for political purposes and that those solicited may decline to contribute without loss of job, union membership, or other reprisal.

*Id.* at 414, 92 S.Ct. at 2264. The purpose of such a standard, the Court said, is to protect the dissenting union member. *Id.* at 414–15, 92 S.Ct. at 2274.

In *United States v. Boyle, supra,* the Court of Appeals for this circuit also addressed a conviction under section 610, this time after that section had been amended to provide as it now does in section 441b(b)(3)(A). Unlike in *Pipefitters,* however, the political contributions at issue in *Boyle* had been made from the union's general treasury financed by dues and not from a segregated fund financed by donations. Therefore, contrary to the defendant's contention, the Court of Appeals held that the trial court did not err in declining to instruct the jury concerning the voluntary nature of the contributed funds. 157 U.S. App.D.C. at 173, 482 F.2d at 762.

The Court of Appeals then addressed Boyle's attack on the constitutionality of section 610.[9] He acknowledged that a purpose of the section was

> to assure that a dissenting union member [was] not *forced* to contribute, in the form of mandatory dues and assessments, to support political views with which he disagrees.

*Id.* at 174, 482 F.2d at 763 (emphasis in original). He argued, however, that this purpose could be achieved in a manner less restrictive of the freedom of speech of the majority of union members. Specifically, Boyle argued that Congress could have sufficiently protected a dissenting union member's rights by approving the system used in Great Britain, which "permits the refunding of a proportionate amount of a member's dues if the dissenter gives notice of his disagreement." *Id.* The Court of Appeals rejected that alternative, however, stating that under the Supreme Court's decision in *Pipefitters,* union members must affirmatively approve of a contribution "by assenting to have a deduction made from the member's pay check." *Id.* at 175, 482 F.2d at 764; *see* R. Cohan, "Of Politics, Pipefitters, and Section 610: Union Political Contributions in Modern Context," 51 *Texas L.Rev.* 936, 988 (1973) (*Pipefitters* differs from the British system in not requiring dissenting member "to be vocal").

---

**8.** Federal Election Campaign Act of 1971, § 205, 86 Stat. 10. The 1976 amendments repealed section 610 from the criminal code and replaced it with the present section 441b(b)(3)(A) in the civil code. Federal Election Campaign Act Amendments of 1976, §§ 112, 201(a), 90 Stat. 491, 496; *see* S.Rep.

No. 677, 94th Cong., 2d Sess. 10 (1976), *reprinted in* [1976] U.S.Code Cong. & Admin.News, pp. 929, 938.

**9.** The Supreme Court expressly reserved judgment on this point in *Pipefitters.* 407 U.S. at 400, 92 S.Ct. at 2247.

■ Because the Supreme Court in *Pipefitters* stated that the principles and purposes of section 610 are the same as those embodied in the current provision, section 441b(b)(3)(A), and because the Court of Appeals interpreted *Pipefitters* as requiring rejection of a refund alternative as a valid means of protecting dissenters' rights, and because the latter court further held such an interpretation of that statutory provision to be constitutional, the FEC submits the reverse check-off must be found to violate the statute because it too requires the dissenter to act to prevent a contribution rather than requiring his affirmative assent to make one. This Court agrees with that analysis.

Defendants' argument against this essentially is that the Supreme Court's decision in *Abood v. Detroit Board of Education,* 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977), should govern. In *Abood* some teachers challenged a state statute permitting

> an "agency shop" arrangement, whereby every employee represented by a union— even though not a union member—must pay to the union, as a condition of employment, a service fee equal in amount to union dues.

*Id.* at 211, 97 S.Ct. at 1787. After finding that this arrangement could cover local government employees, the Court had to address the issue of whether it violated the First Amendment rights of those teachers who objected to various union activities other than collective bargaining, contract administration, or grievance-adjustment, that nevertheless were financed by the required service fees. *Id.* at 211, 232, 97 S.Ct. at 1787, 1798.

The teachers did not raise specific activities or expenditures that the union had engaged in to which they objected but generally alleged that the activities included expenditures "for the expression of political views, on behalf of political candidates, or toward the advancement of other ideological causes." *Id.* at 235, 97 S.Ct. at 1800. The Court declined to hold that the union could not engage in such activities and then

focused on the remedy sufficient to protect the First Amendment rights of the teachers who objected to having their compelled fees used to subsidize those ideological causes. Relying on some of its earlier decisions, the Court concluded that " 'dissent was not to be presumed' " and therefore that the objecting employees had to "affirmatively [make] known to the union their opposition to political uses of their funds" in order to get any relief. *Id.* at 238, 97 S.Ct. at 1801 (quoting *International Ass'n of Machinists v. Street,* 367 U.S. 740, 774, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961)).

From this, defendants argue that because *Abood* states that the burden may be placed on the dissenter to object, a finding that section 441b(b)(3)(A) prohibits reverse check-off, which similarly allocates the burden by requiring the dissenter to request his dollar refund, would mean that the section is not sufficiently narrow to avoid infringement of the associational freedoms of the majority. They contend that because *Abood* was decided after *Pipefitters* and *Boyle,* it should be controlling.

The Court finds defendants' arguments unpersuasive. Nowhere in *Abood* does the Supreme Court make any reference to its decision only five years earlier in *Pipefitters.* If *Abood* is to be read as defendants suggest, the conclusion must be that it significantly modified the holding of *Pipefitters.* Yet, for the Court to have done that without even mentioning *Pipefitters* certainly would be extraordinary.

The conclusion must be then that *Abood* is distinguishable from *Pipefitters* and *Boyle,* and a close analysis reflects that indeed it is. First of all, both of the latter cases specifically interpreted the predecessor of the statute involved here governing union financial support of political candidates. In *Abood,* however, there were only general allegations of compelled support of activities not related to the union's duties as a collective bargaining representative, and as to that the Supreme Court noted:

> To the extent that this activity involves support of political candidates, it must, of course, be conducted consistently with

any applicable (and constitutional) system of election campaign regulation.

431 U.S. at 235 n. 32, 97 S.Ct. at 1800.[10] That "system of election campaign regulation" is the statute at issue here and, accordingly, the cases interpreting it. Thus, the Court's decision did not change that body of law but instead recognized it as involving distinct considerations.

The second important distinction is in the nature of the dissenter's payment that is involved. *Pipefitters,* as here, addressed contributions above and beyond normally assessed dues. Those contributions were to be used only for political purposes. There was no secondary issue concerning the dissenter's obligation to pay his fair share of union representation. In *Abood,* however, the payments at issue were the dues compelled to meet that very obligation. Because they could be used for some purposes other than just to defray the costs of the collective-bargaining relationship, the Court was faced with a balancing requirement in devising a remedy for the dissenter. As the Court stated:

**10.** Similarly, in the two earlier Supreme Court cases principally relied upon by the Court in *Abood,* no issue was presented as to whether the union's challenged political activities violated section 610, the predecessor to section 441b(b)(3)(A). *International Ass'n of Machinists v. Street,* 367 U.S. 740, 773 n. 21, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961); *see Brotherhood of Ry. & Steamship Clerks v. Allen,* 373 U.S. 113, 83 S.Ct. 1158, 10 L.Ed.2d 235 (1963).

**11.** Defendants' reliance on two other cases is equally unpersuasive. They cite the decision in *Kentucky Educators Public Affairs Council v. Kentucky Registry of Election Finance,* No. C 77–0575L(A) (W.D.Ky. Jan. 24, 1978), which approved a reverse check-off procedure. That decision, however, was not interpreting the same statute as in this case but a comparable state law that prohibited collecting political contributions from members by "assessment or coercion." Moreover, the decision, which was issued in the context of a preliminary injunction and not a final determination on the merits, only said that reverse check-off was not coercive. It expressly reserved judgment as to whether that procedure might nevertheless constitute an assessment, which would be the issue most closely analogous to the one at bar. *Id.* at 8.

The other case defendants cite is the recent Supreme Court opinion in *First National Bank*

[T]he objective must be to devise a way of preventing compulsory subsidization of ideological activity by employees who object thereto without restricting the Union's ability to require every employee to contribute to the cost of collective-bargaining activities.

*Id.* at 237, 97 S.Ct. at 1800. Because the Court would not prohibit these ideological activities, because every union member had to pay his dues, and because the cost of these activities would likely constitute the smaller portion of the total dues collected, it was reasonable to put the burden on the dissenter to come forward. In the case at bar, where the payments must be segregated from dues, must be totally voluntary, and are only for the ideological activities, there is no comparable justification for placing the burden on the dissenter.[11]

Although not essential to the Court's holding, a look at some statistics in this case supports the conclusion that reverse check-off results in some unknowing, and therefore, involuntary, contributions. In *Pipefitters* the Supreme Court cited some statistics to demonstrate the voluntariness of a union

*v. Bellotti,* 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978), which declared unconstitutional a state statute prohibiting a corporation from making expenditures " 'for the purpose of . . . influencing or affecting the vote on any question submitted to the voters, other than one materially affecting any of the property, business or assets of the corporation.' " *Id.* at 769, 98 S.Ct. at 1412. In so holding, the Court rejected the argument that the statute served to protect the interests of those shareholders with opinions contrary to those expressed by the corporation through its management, finding the argument not to be compelling when no shareholder has to contribute anything and invests in the corporation voluntarily. *Id.* at 794 & n. 34, 98 S.Ct. 1407. Defendants argue from this that the burden can be put on their dissenters because it too is a voluntary organization. The Court in *Bellotti,* however, specifically noted that protecting the rights of dissenters "in the context of partisan candidate elections," as is presented by the case at bar, is a more compelling interest and that its decision could not be implied to confer comparable rights in the corporation [or union] in that setting. *Id.* at 788 & n. 26, 98 S.Ct. at 1422. Thus, the case is no support for defendants' position.

solicitation that had been the subject of a Congressional investigation:

> From an estimated CIO membership of five million PAC [the Political Action Committee] might have collected $5 million at the requested rate of $1 a member. Yet the national PAC office, which received 50 cents of each $1 donated, obtained only $376,910.77 in 1944 . . . suggesting contributions by less than 800,000 CIO members [i. e., about 16%].

407 U.S. at 418 n. 30, 92 S.Ct. at 2266 (citations omitted). By comparison, the FEC points out, that over the three-year period that reverse check-off was used, 65,000 NEA members received refunds. This represents only 8.5% of those who used payroll deduction indicating a 91% contribution rate among those who did use it. The FEC contends, and the Court agrees, that such a high success rate raises a strong inference that a substantial number who used payroll deduction for their dues did not know the additional dollar contribution also was being deducted.

To support this conclusion further, the FEC cites the change in the collection rate that occurred in Kentucky when that state affiliate began using reverse check-off. The Kentucky NEA instituted reverse check-off in November, 1975. During the preceding year, the largest amount of money contributed in any three-month reporting period was $5,740, and the most members to contribute in any one period was 2,854. Yet, during the first year of using reverse check-off, not less than 21,463 members contributed in any one period and the amount contributed jumped to a low of $18,912 and a high of $82,081. Such a dramatic change suggests inadequate information to the members that the additional amount for political contributions was voluntary.

Defendants do not dispute the accuracy of these figures. Rather, they disagree with the conclusion to be drawn from them.

With respect to the 91% [12] contribution rate over the three-year period among all NEA members using payroll deduction, the defendants respond by contending that such a rate is not surprising, considering that they are not a union shop with mandatory membership. The NEA suggests that because their members voluntarily choose to join, it is likely they also would choose to contribute to its political activities.

Although this argument has some merit, it is not without its weaknesses. First of all, coincidence of viewpoints between a member and a labor organization's employment objectives does not necessarily translate into coincidence of political viewpoints. Secondly, when a member joins, he likely assumes that he will have to pay his fair share of the cost of the union's normal labor activities. It does not follow that he knows he will also be supporting the union's extracurricular activities in the political arena unless he expressly objects.

With regard to the improved results in Kentucky after initiating reverse check-off, the NEA states that accepting the FEC's argument would mean that anytime a collection procedure became more efficient, it would be presumed to have changed into an involuntary procedure. This misapprehends the FEC's argument. The FEC does not rely on just the fact that the number of contributions went up, but that they went up almost tenfold.

■ Implicit in an exchange between counsel for defendants and the Court that occurred during oral argument herein is an acknowledgment that something other than a willingness by the member to be associated with the union's political activities operates to make reverse check-off so advantageous to the union's funding mechanism. In response to the Court's inquiry as to how the Kentucky affiliate had collected contributions prior to using reverse check-off, NEA's counsel stated:

---

12. The NEA suggests that this figure should be 70–75% because 20% of its members do not use payroll deduction at all. The issue, however, is whether those who do use payroll de-

duction know they are making the political contribution. Therefore, the figures regarding those who do not use it are irrelevant.

. . . Letters were sent out asking people to mail in some money to the Kentucky Education Association. Individual building representatives were told with all your other tasks, try and get a dollar from these people if they are willing to contribute, or two dollars for the state funds. The fact of the matter is it didn't work, not because people were coerced or not coerced. It has never worked with us if it is dues or insurance or anything else.

. . . [I]t is well recognized that if you take away the mechanism of payroll deduction you won't collect a penny from these people, and it has nothing to do with voluntary or involuntary. I think it has to do with the nature of the beast, and the beasts who are our teachers who are dispersed all over cities who simply don't come up with money regardless of the purpose.

Transcript at 19–20. This additional element thus appears to be a curtain of indifference that envelopes the NEA's members when finances are involved. With respect to their dues, defendants raise this curtain through payroll deduction. While it is still up, they add to the deduction the additional dollar for their political action fund. Then through reverse check-off, they lower the curtain back around its members to cause that indifference to insulate the union from requested refunds. The Supreme Court said in *Pipefitters* that the essence of whether a contribution is actually or effectively required for union membership in violation of the statute "is whether the method of solicitation for the fund was calculated to result in knowing free-choice donations." 407 U.S. at 439, 92 S.Ct. at 2276. In this Court's view, "knowing free-choice" means an act intentionally taken and not the result of inaction when confronted with an obstacle.

In *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam), where the Supreme Court declared the Federal Election Campaign Act's limitations on the amount of political contributions to be constitutional, the Court noted that the Government's primary interest is in the prevention of corruption and the appearance of corruption spawned by the real or imagined coercive influence of large financial contributions on candidates' positions and on their actions if elected to office.

*Id.* at 25, 96 S.Ct. at 638. With large political action funds, the union can still have a significant influence in national elections even if the amount they can contribute to any one candidate is limited. The same interest advanced by *Buckley* is also served by ensuring that every dollar in that political action fund is knowingly and intentionally given. To achieve that, the burden must be on the solicitor and not the dissenter. This limitation on the union's First Amendment rights is certainly far less severe than the amount of contribution limitation validated in *Buckley.* That was upheld because it "safeguard[ed] the integrity of the electoral process," did not directly interfere with protected political expression, and did not perceptibly reduce "the number of issues discussed, the depth of their exploration, and the size of the audience reached." *Id.* at 58, 96 S.Ct. at 653; *see id.* at 22, 96 S.Ct. at 612. That justification equally applies to invalidating reverse check-off.

This Court's decision does not preclude the defendants from using the payroll deduction method for funding its political action committee. It simply requires that the union member be asked beforehand if he wants a contribution to be deducted along with his dues. Although the NEA essentially concedes that in theory this is a resolution to the problem, it contends that this alternative is not viable because of lack of cooperation from the school districts. According to defendants many school districts require that a uniform amount be deducted. Thus, if some members want to contribute the additional dollar and others do not, uniformity would be lacking. Since reverse check-off, which would permit uniformity, is prohibited, that means only dues could be deducted and a separate solicitation would have to be made for the contributions.

It appears, however, that some school districts will permit unequal deductions. The burden on defendants caused by those that require uniformity should not be shifted onto union members who choose not to contribute. Instead, the union should solicit contributions in those districts by cash or check while making unequal deductions a priority item for collective bargaining if it is so important to the success of its fundraising.

Having concluded, therefore, that reverse check-off is per se violative of section 441b(b)(3)(A)'s prohibition against financing political funds by "dues, fees, or other moneys required as a condition of membership in a labor organization," it is unnecessary for the Court to determine whether the system as operated by defendants was illegal because it failed to inform the members of their right to a refund or made the refund procedure too burdensome to be effective.[13]

### III. *Defendants' Motion for Summary Judgment on the Counterclaim.*

"The primary relief sought in the counterclaim is a declaration that the reverse check-off is itself lawful  .  .  .." [14] The Court's decision to grant plaintiff's motion for summary judgment on the complaint obviously requires denying defendants' motion insofar as it applies to use of reverse check-off by itself. That does not entirely dispose of the counterclaim, however. Defendants further ask that reverse check-off be declared valid if used in conjunction with other options. These options are:

(1) cash payment of annual dues in a single lump sum;

(2) cash payment of annual dues in not less than three installments; and

(3) premembership reimbursement whereby the political contribution would continue to be deducted automatically from the employee's paycheck but if a refund were requested, it would be returned at the time of membership enrollment instead of at a later date as under the standard reverse check-off procedure.

As earlier noted, defendants submitted these same proposals to the FEC for an advisory opinion as to their legality. With respect to the lump sum cash payment option, the Commission unanimously held that it is not an acceptable alternative to reverse check-off. The Commission noted that although a lump sum cash payment would not include a political contribution, a dissenting member would not be able to avail himself of a payroll deduction option free of reverse check-off. Because most NEA members want to use the more convenient payroll deduction method of paying their dues and because average annual dues are approximately $129.00, the Commission concluded that this lump sum option would place too great a burden on the dissenter in exercising his right to dissent.[15]

With respect to the cash installment option, the Commissioners rendered no opinion. Even when the number of installments was increased to not less than twelve, the Commission could not achieve the necessary four vote majority on the issue.[16]

Finally, with one dissenting vote, the Commission also rejected the premembership reimbursement option. The majority reasoned that "[t]he essence of the illegality of the reverse check-off procedure goes to how and why the funds are collected and not to the timing of the dissenting member's reimbursement." [17]

---

13. It is thus unnecessary to address defendants' contention that material facts are in dispute because all those facts involve the operation of reverse check-off and not whether reverse check-off inherently violates the statute.

14. Defendants' Opposition to Plaintiff's Motion for Summary Judgment at 15.

15. Federal Election Commission Advisory Opinion 1977–37, at 4–5 (Apr. 14, 1978), Part B of Attachment 1 to Plaintiff's Memorandum of Points and Authorities in Opposition to Defendants' Motion for Summary Judgment.

16. *Id.* at 5.

17. *Id.* at 6.

As a threshold matter, the FEC challenges the Court's jurisdiction to rule on the validity of the options presented in defendants' counterclaim. Alternatively, it challenges the propriety of exercising any jurisdiction the Court may have on the ground that the lack of any concrete factual setting makes the issues inappropriate for resolution.

The basis for the FEC's lack of jurisdiction argument is that the counterclaim essentially seeks review of the Commission's advisory opinion, even though it is not presented as such, and that the statutory scheme created by Congress is designed to preclude such review. The Court need not decide that point, however, for, assuming arguendo that there is jurisdiction, the Court agrees with plaintiff that the counterclaim is not sufficiently ripe to merit the exercise of that jurisdiction.

■ In *Abbott Laboratories, Inc. v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), the Supreme Court said that "declaratory judgment remedies are discretionary, and courts traditionally have been reluctant to apply them to administrative determinations unless these arise in the context of a controversy 'ripe' for judicial resolution." *Id.* at 148, 87 S.Ct. at 1515. In deciding if sufficient ripeness exists, the Court stated two factors for consideration: whether the issues presented are fit for judicial decision and whether withholding review would cause undue hardship on the parties. *Id.* at 149, 87 S.Ct. at 1515. Having considered these factors, the Court concludes that sufficient ripeness is lacking, and therefore it will not address whether reverse check-off used in conjunction with the proposed options is permissible under section 441b(b)(3)(A).[18]

Whether these proposals would result in voluntary contributions or effective assessments depends on too many facts not avail-

able for the Court's consideration in this context, for example: (1) How would NEA members be informed of the various options? (2) How effective is that system? (3) In order to determine the size of the financial burden, how much are the lump sum or installment cash payments? This certainly is not an exhaustive list, but it illustrates the nature of the problem the Court faces.

Additionally, there is no undue hardship on defendants in withholding review. The defendants contend, of course, that this particular prong of the *Abbott Labs* test is satisfied, citing this Court of Appeals' decision in *Continental Air Lines v. CAB,* 173 U.S.App.D.C. 1, 20, 522 F.2d 107, 126 (1974) (en banc), wherein it said:

> Characteristically, the hardship of delayed review is that it places those who seek it in the following dilemma: in the meantime they must either comply with the agency's policy, at some expense which they maintain is unnecessary, or they must risk incurring the sanctions for non-compliance should they turn out to be wrong. If this dilemma is sufficiently acute, then the policy has been "felt in a concrete way by the challenging parties."

*Id.* at 20, 522 F.2d at 126 (quoting *Abbott Labs, supra*). Defendants then state that they "are confronted with precisely this type of dilemma." The critical element from that court's opinion, however, is not just whether the "dilemma" is presented, but whether that "dilemma is sufficiently acute." That acuteness is lacking here.

■ Defendants' ultimate objective here is to collect contributions for NEA–PAC. They will not be prevented from doing that if a declaratory judgment regarding the legality of their preferred methods of collection is not forthcoming. They will still have other methods they can use. Al-

18. The Court's decision not to decide the counterclaim is consistent with the apparent intent of Congress in granting the FEC authority to issue advisory opinions. By making such opinions binding and protecting from liability those who act in good faith upon them, Congress essentially has given to the Commission the authority to make declaratory judgments in this area of the law. Moreover, because the Commission was created to have an even number of Commissioners, six, Congress at least implicitly recognized that there would be instances when, because of a three-to-three split, no advisory opinion would be forthcoming.

though the administrative costs of these other methods may be somewhat greater, an increased financial burden in and of itself does not create the necessary hardship. *See Abbott Labs, supra,* at 153–54, 87 S.Ct. at 1507.

Any injury defendants may suffer is far less severe than the hardship that confronted petitioners in the companion cases of *Abbott Labs, supra,* and *Gardner v. Toilet Goods Ass'n,* 387 U.S. 167, 172–73, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967), wherein the Supreme Court set out the standards for ripeness. In fact, defendants' circumstances are more closely analogous to the facts of another case that the Supreme Court addressed along with the two cases just mentioned. In *Toilet Goods Ass'n v. Gardner,* 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967), the petitioner was challenging a Food and Drug Administration regulation concerning access to color additive manufacturing facilities for inspection purposes. There the Court noted that

> a refusal to admit an inspector here would at most lead only to a suspension of certification services to the particular party, a determination that can then be promptly challenged through an administrative procedure which in turn is reviewable by a court. Such review will provide an adequate forum for testing the regulation in a concrete situation.

*Id.* at 165, 87 S.Ct. at 1525 (citations omitted). Similarly, defendants here can, if they choose, proceed with one of the alternative methods of collection which, if challenged, can be presented for administrative and, if necessary, judicial review "in a concrete situation."

IV. *Conclusion.*

Having granted plaintiff's motion for summary judgment and having denied defendants', it is now necessary to address the relief plaintiff requests in its complaint. As earlier noted, plaintiff asks that defendants be enjoined from further use of reverse check-off, be ordered to return all money collected by it, and be assessed a civil penalty. The Court concludes that, although the injunctive relief is merited, the two remaining remedies are too severe.

█ Certainly many NEA members who used reverse check-off knew that the dollar political contribution was being deducted and wanted to make that contribution. Requiring the NEA to return all money collected would thus infringe unnecessarily on the rights of those members. Instead, the Court will order defendants to work with the Commission to devise a plan whereby defendants will inform their members of the nature of this lawsuit and its result and provide any member who wants the dollar deduction to be refunded an opportunity to obtain it without incurring any expense in communicating that desire to the defendants. Such a plan will be submitted to the Court for its approval.

█ A civil penalty in this case is unwarranted. Defendants' violation is not in the nature of intentional disregard of the rights of its dissenting members through coercion, threats, and reprisals. Rather, it is indirect infringement of those rights through excessive zeal in trying to have a more efficient collection system. The expense defendants will incur in making refunds in accordance with the above-ordered plan will be a sufficient penalty without adding a fine to it.