**James WITHROW, Appellant,**

v.

**Lavern WILLIS and Henry Willis, County Court Clerk of McLean County, Kentucky, Appellees.**

Court of Appeals of Kentucky.

Oct. 14, 1969.

Concurring Opinion Oct. 24, 1969.

**628**

———◆———

Richard D. Gilliam, Jr., Hugh D. Moore, Gilliam & Moore, Owensboro, for appellant.

Clarence Bartlett, Bartlett, McCarroll & Nunley, Owensboro, for appellees.

CLAY, Commissioner.

Appellant is a defeated candidate for the Republican nomination for the office of county judge of McLean County. The primary election was held May 27, 1969. Subsequently he filed this suit (which is *not* an election contest) under the provisions of KRS 123.991(4) against appellees, the successful candidate and county clerk, to have the nomination declared void and to enjoin the clerk from placing the candidate's name on the ballot for the No-

vember election. The principal ground asserted was that appellee candidate (hereafter "Willis") had failed to appoint a campaign treasurer and designate a campaign depository at the time specified in KRS 123.071(1) (a section of the "Corrupt Practices Act"). The Chancellor adjudged there had been compliance with the statute and dismissed appellant's complaint.

The first question presented, which we consider dispositive of the controversy, is whether appellant has a cause of action. Admittedly he is a registered voter and the violations alleged fall within the scope of KRS 123.991. Subsection (4) of that statute provides:

> "Any registered voter may sue *for injunctive relief to compel compliance with the provisions of* KRS 123.005 or 123.051 to 123.101." (Emphasis added.)

Appellant did *not* bring this suit *to compel compliance* with the filing and reporting provisions of the statutes involved. The prayer of his complaint was to have the court (1) declare Willis' nomination void, and (2) enjoin the county clerk from placing Willis' name on the ballot. It was alleged, and we will assume for the purpose of discussion, that Willis had failed to make a timely appointment of a campaign treasurer and a designation of a campaign depository required by KRS 123.071(1); that he had failed to make a timely report as his own campaign treasurer required by KRS 123.086(2) (b); and that his campaign depository had failed to file with the Kentucky Registry of Election Finance the statements required by KRS 123.-091. As we have said above, however, this suit was not brought *to compel compliance* with the filing and reporting provisions of those statutes.

It is contended by appellant that since KRS 123.071(1) provides the candidate's "qualification shall not be complete" until he has properly appointed his campaign treasurer and designated a campaign depository, and since KRS 123.991(2) provides that the nomination of a candidate

who violates the statutes here involved "shall be void", this suit is authorized to effectuate Willis' forfeiture of the nomination. But KRS 123.991(4), which is the only source of appellant's claimed cause of action, does not bestow that right. It only authorizes appellant to sue *to compel compliance* with those two statutes.[1]

KRS 123.991(4) does not provide who may be sued for injunctive relief. Clearly it contemplates as a defendant someone required to do the acts specified. KRS 123.-071(1) does not require anyone to take cognizance of or to act upon a candidate's disqualification. KRS 123.991(2) does not require any one to take cognizance of or act upon a void nomination. Thus a registered voter is not authorized to bring suit against anyone to enforce the forfeiture provisions of those statutes.

If the legislature had intended to allow any registered voter the right to sue to have a nomination (or election) declared void, or to enjoin the placing of a candidate's name on the ballot, it would have been quite simple to have said so. However, the best evidence of what the legislature intended is the plain language it used. We are simply construing literally the explicit wording of KRS 123.991(4) which prescribes the scope of the remedy appellant, as a registered voter, may invoke.

Prior to the enactment of the statutes here involved (in 1966), it had long been the settled law that taxpayers or electors could not bring suit against successful candidates to determine whether the "Corrupt Practices Act" had been violated. Dietz v. Zimmer, 231 Ky. 546, 21 S.W.2d 999 (1929); Sparks v. Boggs, Ky., 339 S.W.2d 480 (1960). If the legislature had intended a complete reversal of this policy, we believe a clear expression of such a purpose would have been incorporated in the 1966 Act. It is true a restricted remedy was therein given registered voters "to

compel compliance". (KRS 123.991(4)). But that was all. We cannot stretch the language to encompass the relief appellant here seeks.

Had there not been other remedies to carry out the purposes of and enforce the penalty provisions of the Act, we could envision some justification for straining KRS 123.991(4) beyond its literal meaning. However, the disqualification and voiding provisions of the statutes may be invoked by other persons under other laws. A defeated candidate (such as appellant) could contest the nomination under KRS 122.020. County attorneys are authorized to institute actions against usurpers of county offices. KRS 415.040. Public officials who have election duties to perform may, under proper circumstances, raise the very questions here presented by appellant. Dempsey v. Stovall, Ky., 418 S.W.2d 419 (1967). KRS 118.400(1) provides in substance that the county board of election commissioners shall not issue certificates of election to candidates who have failed to comply with KRS 123.065 to 123.101. Of course there are also criminal penalties for violation of the "Corrupt Practices Act". KRS 123.990, 123.991 and 123.992.

It is not the intention of this court to defeat the will of the legislature to create an effective and enforceable "Corrupt Practices Act". In view of the other remedies above pointed out, the nature of the restricted remedy given any registered voter by KRS 123.991(4) simply does not encompass such voter's right to have an election declared void. We do not feel justified in writing such a provision into the Act.

KRS 123.991(4) does not authorize the appellant to sue Willis to have his nomination declared void, nor does it authorize him to sue the county clerk to enjoin him from placing Willis' name on the ballot. There is no other source of his claimed right of action. Having no right to sue,

1. This may appear as an illusory right with respect to some of the statutes specified in KRS 123.991(4), but that is the only remedy afforded.

his complaint was properly dismissed. The Chancellor based his judgment on findings of fact and conclusions of law to the effect that Willis had complied with the law. In view of our holding in this opinion, such an adjudication was inappropriate and appellant's complaint was improperly dismissed on this ground. The judgment should be modified to show that the basis thereof was appellant's lack of capacity to maintain this suit to raise the question of Willis' alleged noncompliance with the statutes involved.

As modified consistently with this opinion, the judgment is affirmed.

MILLIKEN, NEIKIRK, PALMORE, REED and STEINFELD, JJ., concur.

EDWARD P. HILL, Jr., C. J., and OSBORNE, J., dissent.

OSBORNE, Judge (dissenting).

### WELCOME BACK LITTLE BLACK BAG

After the 1966 Legislature enacted a New Corrupt Practices Act, it appeared the little black bag that historically made its appearance on the eve of every Kentucky election might be a thing of the past, like the butter mold and spinning wheel. With today's opinion, this court has rescued the little black bag from the antique collector and restored it to a new, active life in the political affairs of this state. The effect of today's opinion is to again hold that a voter and taxpayer has no standing in court to question the right of one who has attained public office by gross violations of the Corrupt Practices Act. We still adhere to the dogma that the private citizen should not meddle in the affairs of the professional politician. To permit the amateurish citizen to question the activities of the professional could prove embarrassing, time-consuming, expensive and generally a nuisance. So, by today's opinion we correct what was an obvious mistake made by an ill-advised and ill-informed Legislature, by holding that the only right the citizen has under KRS 123.005 etc., is to file an injunction suit to require a thing to be done on a date when it was not done. Since it is obvious the thing can never be done on the date it was not done, then the right to file such suit is a joke and a mockery.[1] We are singing the second refrain of an old song. You sued the wrong man; you sued too late; you sued in the wrong court and you brought the wrong kind of action. Use any excuse, just don't let him win.

A condensed history of the matters that lay in the background of today's opinion is as follows:

In 1916, the Legislature of this state enacted our first Corrupt Practices Act. By its terms, this Act,

1. Prohibited corporations from making political contributions.

2. Prohibited bribes in the forms of political contributions.

3. Prohibited candidates from selling powers of office in the form of political promises made in exchange for contributions.

4. Limited the amount a candidate could spend and the manner of making expenditures in seeking public office.

5. Required the candidate for public office to file an account for expenditures made in seeking the office along with a statement of contributions received by him.

The Act provided deadlines when the filings were to be made and required, "no office or board authorized to issue a certificate of nomination or election shall issue a certificate of nomination to any person until he has filed the statements required. * * *" The Act also provided criminal penalties for the failure to file the reports and other violations.

---

1. The majority opinion admits that this may be an illusory right. An illusory right is one that does not exist. This one does not.

As would be expected, it was not long before this Act came before the courts. At the regular election, November 6, 1917, M. S. Saylor and Z. R. Colwell were candidates for Justice of the Peace in Leslie County. Saylor did not file a statement of election expenses in the time required by the statute. The election commissioners, in compliance with the Act, refused to issue to him a certificate of election. He brought suit to require the commissioners to issue the certificate and received a judgment in his favor. This court affirmed holding that the time requirements for filing a statement of expenses under the Act were directory and not mandatory, therefore, Mr. Saylor was quite justified in ignoring the Act and making no filing until the election was long over. This was the first crippling blow dealt the Act by this court. See Sparkman v. Saylor, 180 Ky. 263, 202 S.W. 649.

The next serious blow came in Dietz, et al. v. Zimmer, et al., 231 Ky. 546, 21 S.W.2d 999. Here, this court held that a private citizen has no standing to challenge the rights of a candidate to public office even though he has violated every rule in the book. Not only did the court summarily dismiss the citizen's claim of a right to challenge an election, it refused to indicate what could be done about the situation. In the course of its opinion, the court said, "neither is it necessary at this time to indicate the remedy that may be available if the candidates were held to be guilty of a violation of the law." Concerning the right of a citizen to maintain such suit, the court said, "the appellees" (citizens and taxpayers) "are not interested or concerned in anything embraced within the provisions of the statute."

After the decision in the Dietz case, there was nothing left of the 1916 Act but the criminal sanctions which were never applied. I have not found a case where a candidate has been indicted and tried for violation of the 1916 Corrupt Practices Act. Prosecutors in this state just do not seem to relish the job of prosecuting successful candidates for a little healthy cheating during the election.

There were many cases decided by this court between 1916 and 1966 interpreting and applying the 1916 Act. When these cases are examined, it becomes obvious the court is attempting in each case to uphold the man who got the most votes in the ballot box without a great concern as to how he got them there. The Act was gradually weakened by successive judicial interpretations until in the end it had no effect whatsoever in the regulation and conduct of elections. Matters became so serious that the Legislative Research Commission, in 1965, issued a Research Report #28 on the legislative history of the Corrupt Practices Act. In this report, this Commission states: "The Kentucky Corrupt Practices Act is extinct." The Report makes several recommendations, one of which is the law should require, "complete financial reports both before and after elections at a *specified* time. This requirement should be *strictly* enforced." (Emphasis added.) Legislative Research Report #28, at page 14.

At its 1966 session, the Legislature did just what the Research Commission recommended, it enacted an entirely new Corrupt Practices Act, KRS 123.005 to KRS 123.992. This new Act created an independent agency of the state government known as the Kentucky Registry of Election Finance that provides for the selection of a five-member board and the hiring of professional help. The Registry is given board powers to enforce the Act, including the right to adopt administrative regulations, to hold hearings and the power of subpoena, KRS 123.060.

After sharply limiting the method of making and receiving campaign contributions, the Act provides:

"(1) Each candidate in an election shall appoint one campaign treasurer and shall designate a campaign depository on or before the date of public announcement of his candidacy or on the date he

files as a candidate, whichever is sooner. The candidate may appoint himself or any other registered voter in Kentucky as his campaign treasurer and may designate any bank authorized by law to transact business in Kentucky as his campaign depository. The candidate shall file the name and address of the campaign treasurer and the campaign depository with the registry, *and his qualification shall not be complete until he has met this requirement.*" (Emphasis added.)

It will be noted that the qualifications of a candidate are not complete until he has met the provisions of this section. In a primary election, this section must be read in conjunction with KRS 119.050, which is entitled, *Qualifications for nomination; form of nomination papers.* This section provides the form and content of papers which must be filed with the county court clerk or the secretary of state, as the case may be. It limits the right of the candidate to have a name printed upon the ballot to only those who have complied with its terms. "When so filed with the proper officer, and upon payment of the fees provided in KRS 119.250 the officer shall have the candidate's name printed upon the ballot according to the provisions of this chapter." When these facts are considered together, it becomes as plain as can be that a candidate has not completed his qualifications under KRS 119.050 until he has complied with KRS 123.070(1).

The Legislature, being fully informed as to how this court has emasculated the 1916 Act and conscious of the fact that officials are not prone to prosecute those who violate election laws, placed the following provisions in the penalty section of the Act.

"KRS 123.991(2) The nomination for, or election to, an office of any candidate who violates any provision of KRS 123.-005 or 123.051 to 123.101, or whose campaign treasurer or any deputy campaign treasurer violates a provision of KRS 123.005 or 123.051 to 123.101, with such candidate's knowledge, *shall be void,* and the office or candidacy shall be filled as provided by law for the filling of a vacancy. * * * KRS 123.991(4) Any registered voter may sue for injunctive relief to compel compliance with the provisions of KRS 123.005 or 123.051 to 123.-101." (Emphasis added.)

The action taken this day by the majority of this court will, in my opinion emasculate this Act the same as was done to the Act of 1916. There is no reason that I know to place the narrow, technical, restrictive construction upon this Act as is done in the majority opinion.[2] The Act provides that any registered voter may sue for injunctive relief to compel compliance with its provisions. One of its provisions is that the nomination of any candidate who fails to make filings as required by the Act is "void." Why the court refuses to enforce this, I know not. The most logical suit to be brought is one against the county court clerk to prevent the name from going upon the ballot, just what appellant instituted.

The League of Women Voters worked hard to get this legislation passed. They held meetings over the state and packed the galleries of the Legislature when the Act was under consideration. It was their sincere hope that elections in Kentucky could be policed and cleaned up. After today's opinion I can only observe, "better luck next time, girls."

The election season is approaching. The political bite is on and the little black bag is being filled for the coming event. These facts are observed in an editorial in The Marshall Courier.

2. The initial construction of any statute is largely a policy matter. As this is the first time we have considered these sections, we have broad latitude in determining what the legislature intended. I can't help but wonder what the outcome would be if a salary increase for the members of the court was in issue and dependent upon a broad construction of the Act. See Matthews v. Allen, Ky., 360 S.W.2d 135.

"The recent news from the Associated Press how the Republican administration in Kentucky twists the economic arm of firms doing business with them in order to get donations for their party isn't as strange as everyone seems to think. All administrations have been doing this for decades * * * and will continue for more decades. What is really strange, is the thought that after taxes * * * where in the world can a business find enough cash to call it a donation?" Editorial, The Marshall Courier, October 9, 1969.

Someday the man in the street, who is given the dubious honor of fighting the wars and paying the taxes to support this government of ours will also be given the right to legally question the acts of its officials. What's wrong with a citizen and taxpayer questioning the right of a man to steal a public office? What's wrong with a citizen's right to question government officials concerning kickbacks, corrupt contracts, bloated expense accounts, etc.? Our opinion today is a serious stumbling block along the road to the day citizens will enjoy these rights, but it is not final, there will be another fight another day. In the meantime, we can all ponder why the college student is not satisfied with things the way they are.

For the foregoing reasons, I dissent.

Welcome back little black bag; smiling, serene, with your bloated sides, you won a round today, but your days are numbered!

EDWARD P. HILL, Jr., Chief Justice (dissenting).

I am unable to place on KRS 123.005 the narrow and literal interpretation adopted by the majority opinion. I would interpret the statute as giving a citizen a right to "enforce performance" of every requirement of the statute or to have the courts adjudicate any and all declarations contained in the statute.

For this reason I respectfully dissent.

MILLIKEN, Judge (concurring).

The dissenting opinion constrains me to state reasons why the majority opinion is correct.

Had there been corruption in this primary election on the part of Willis, the successful candidate, the defeated candidate, Withrow, had a clear-cut remedy by contesting the election within fifteen days from the date of the primary (KRS 122.020), but in contesting the election Withrow himself would have had to be free of fraudulent practice or his contest would have been dismissed (KRS 122.010). Withrow did not allege fraud on the part of Willis, but rather alleged failure on the part of Willis to file financial reports with the election Registry and sought to invoke a remedy under the Corrupt Practice Act which affords any registered voter the right to " * * * sue for injunctive relief to compel compliance with the provisions" of the Act, and to have Willis' nomination thus voided for alleged failure to file data with the election Registry.

If we assume arguendo that Willis failed completely to file with the Registry the financial data required by the Act, nevertheless, this provision gave a registered voter only the right to sue "to compel compliance" on the part of the candidate, but that is where this remedy stopped. It did not give any registered voter the right to sue the candidate to void his nomination, nor did it give any registered voter the right to enjoin the county clerk from putting the nominee's name on the ballot. The Corrupt Practice Act, in another provision, directs the Registry " * * * to report to the Attorney General and the Commonwealth attorneys" a list of persons and candidates who have failed to comply with the filing provisions of the Act, KRS 123.990(3), thus turning over to the proper government officials the obligation to take appropriate action for violations of the Act, which is the same course followed with all major violations of criminal or penal statutes. Failure to comply with the filing requirements of the Act may not

only void an election or nomination but also expose violators to a fine up to $1000 or imprisonment for a year, or both. KRS 123.990(1).

Since the Corrupt Practice Act, thus, is penal in its nature, this court must construe it strictly as it would any other penal or criminal statute (26 Am.Jur.2d, Elections, Section 288) and not stretch the right given a registered voter to sue "for injunctive relief to compel compliance" to cover situations obviously not intended. The Act specifically leaves to the Registry, the Attorney General and the Commonwealth attorneys the exclusive power to invoke its penalties.

The elective process in a democracy must be orderly as well as honest, and our Corrupt Practice Act affords means to protect both objectives.