KENTUCKY EDUCATORS PUBLIC AFFAIRS COUNCIL, a/k/a Kepac, An Unincorporated Association, Doris E. Wilson, Wayne Harvey, Lyndle Barnes and Billy Jean McDade, Plaintiffs-Appellees,

v.

KENTUCKY REGISTRY OF ELECTION FINANCE; Stanley L. Chauvin, Jr., Elmer N. Carrell, Charles R. Coy, Foster Ockerman, C. J. McNally, Defendants,

and

Robert A. Roos and Marty A. Craig, Defendants and Intervening Defendants-Appellants.

No. 79–3421.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 16, 1980.

Decided May 13, 1982.

**1126**

Ronald L. Gaffney, D. Paul Alagia, Barnett & Alagia, Louisville, Ky., for defendants and intervening defendants-appellants.

Robert I. Cusick, Jr., Tarrant, Combs & Bullitt, Louisville, Ky., for defendants.

John Frith Stewart, Kenneth L. Sales, Dennis Franklin Janes, Segal, Isenberg, Sales & Stewart, Louisville, Ky., for plaintiffs-appellees.

Allen Prewitt, Louisville, Ky., for Ky. Registry of Election Finance.

Milton L. Chappell, Springfield, Va., Paul D. Kamenar, Washington, D. C., amicus curiae for National Right to Work Committee.

Before MERRITT and BROWN, Circuit Judges, and NIXON,* District Judge.

JOHN T. NIXON, District Judge.

The intervening defendants below, Robert Roos and Marty Craig, appeal from the District Court's grant of summary judgment in favor of plaintiff-appellee Kentucky Educators' Public Affairs Council and its officers. [hereinafter collectively referred to as "KEPAC"] The defendant Kentucky Registry of Elections Finance did not appeal but joins with Roos and Craig as an *amicus curiae*. The National Right to Work Committee also appears as *amicus curiae*. The District Court enjoined the Registry and its members from interfering

---

* Honorable John T. Nixon, United States District Judge for the Middle District of Tennessee, sitting by designation.

with certain political activities of KEPAC protected by the First and Fourteenth Amendments to the United States Constitution. We affirm.

## I

The journey of this case to its present posture has been a rather tortuous one and a thorough recapitulation is essential to a proper understanding and consideration.

In 1974, the Kentucky legislature enacted the Kentucky Corrupt Practices Act [KRS Chapter 121, hereinafter "the Act"]. The purpose of the Act is to regulate the financing of campaigns for public office and other activities involving questions to be submitted to the State's voters. The Act places limitations on contributors and prohibits corporations from contributing money, services, or other things of value toward the nomination or election of any state, county, city, or district officer. The Act also prohibits the use of coercion in obtaining funds from state or federal employees. For the purpose of enforcing its provisions, the Act creates the Kentucky Registry of Election Finance [hereinafter "Registry"] composed of five members appointed by the Governor.

The Registry is empowered to receive sworn complaints from registered voters, conduct preliminary investigations, hold hearings, and if it finds reasonable grounds to believe that a violation of the Act has occurred it shall notify the Kentucky Attorney General or the appropriate Commonwealth's Attorney of the suspected violations.[1]

The maximum penalty for violation of the Act is a $10,000 fine and one year imprisonment.

KEPAC is an unincorporated political action committee established by the Kentucky Education Association [hereinafter "KEA"]. KEA is a non-profit corporation organized under the laws of Kentucky and with headquarter offices in Louisville. It is a state-wide employee organization composed primarily of teachers and other personnel who are employed in the various Kentucky elementary and secondary systems. Membership is voluntary and currently the rolls list 27,000 members. Since 1968, KEA has been affiliated with the National Education Association [hereinafter the "NEA"]. The vast majority of the NEA's 1.7 million persons are public school teachers.[2] All members of the KEA are required to join the NEA. However, membership in the KEA and the NEA is not a requirement for employment in any of Kentucky's various school systems.

The KEA is barred from making political contributions from the treasury created by its members' dues. Therefore, like many corporations and labor organizations, it has established a separate political arm, in this case, KEPAC. KEPAC makes contributions in national, state, and local political contests. Its treasury is completely separate from KEA, but is derived almost exclusively from the contributions of KEA members. Currently, slightly over 85% (23,000 of 27,000) of the KEA membership contributes to KEPAC. Contributions to KEPAC, however, are not a prerequisite for becoming or remaining a member or officer in KEA.

Contributions to KEA and KEPAC are accomplished in the following manner:

Kentucky law authorizes local school systems to deduct KEA dues and other membership dues from salary checks. The deduction can be made only upon request of an employee or group of employees. This payroll deduction plan, called Automatic Payment Authorization, [hereinafter, "APA"] has long been in use in Kentucky.[3] Since 1975, KEPAC has used a "reverse check-off" system in conjunction with KEA's payroll deduction of dues to obtain contributions. Under the reverse check-off system used by KEPAC, all KEA members executing APA forms have contributions,

---

1. KRS 121.140.

2. *See Federal Election Commission v. National Educators Association*, 457 F.Supp. 1102 (D.D. C.1978).

3. RS 161.158.

along with dues payments, insurance premiums, and retirement fund contributions, deducted from their salary checks unless the KEA member affirmatively checks off that she or he declines to contribute to KEPAC. The aims and activities of KEPAC are explained on the APA form.[4] If a KEA member does not initially check off his or her designation to contribute to KEPAC, an automatic contribution is made. If the member does check off, and yet, subsequently decides not to participate, the member can stop the deduction and can also obtain a refund of past contributions.[5] Separate forms are used for members who wish to contribute to KEPAC but not through the payroll deduction system.

Prior to the development and utilization of the reverse check-off procedure in 1975, contributions from KEA members to KEPAC had been modest at best. During the year immediately preceding, the largest total amount contributed in any quarterly reporting period was $5,740, and the greatest number of members contributions in any quarter was 2,854. During the first year that the reverse check-off system was in effect, the lowest number of KEA members contributing in any one reporting period was 21,463. The highest amount of money contributed in any period was $82,081 and the lowest amount was $18,912.[6]

Both intervening defendants, Robert A. Roos and Marty A. Craig, were members of KEA who did not check-off and did not seek refunds.

A complaint about KEPAC, KEA and the APA/Reverse Check-Off System was filed with the Registry pursuant to KRS 121.140 and on November 4, 1977, following administrative hearings, the Registry issued its Findings of Fact, Conclusions of Law and Order holding that boards of education throughout Kentucky, KEA, and KEPAC were soliciting and collecting political contributions in a manner violative of the Act. Specifically, the Registry concluded:

(1) Boards of Education which are engaged in the deduction of KEPAC . . . contributions from the salaries of KEA members are rendering a service or other things of value to KEPAC . . . in violation of KRS 121.025.

(2) KEPAC is a committee as defined in KRS 121.015 (3), and should report receipt of services or other things of value received by it.

(3) The "reverse check-off" method of collecting political contributions as described in the evidence is coercive and is being participated in by Boards of Education, KEA, [and] KEPAC . . . in continuing violations of KRS 121.320.

(4) The 'local committees' described in the evidence are within the definition of 'committee' contained in KRS 121.015(3) in that they are furthering political candidacies and are therefore required to register individually.[7]

KRS 121.320 prohibits the use of coercion in obtaining funds from state or federal employees in the following language:

No person shall obtain or attempt to obtain money by assessment or coercion from any state or federal employee with the purpose of using the money to promote or aid the candidacy of any person, or any political party, or any question to be voted upon by the voters of this state, or any section or portion of this state in any state, national, district, county, city or precinct election, or primary election, or in securing delegates or in any manner where nominations are to be made by convention. Every assessment and each act of coercion shall constitute a separate offense.

The term 'assessment' as used in this section, means the fixing of any amount, to be given in money by an employee, and the soliciting of that amount or any amount in money from a person so assessed. The term 'coercion as used in this

---

4. Supplemental Appendix, Volume III, Exhibits a–401.

5. There is a deadline for refund requests, but the record indicates the deadline was never enforced.

6. Findings of the District Court in *Federal Election Commission v. National Education Association,* 457 F.Supp. 1102 (D.D.C.1978) at 1108.

7. Registry's Findings of Fact, Conclusions of Law, Order, Joint Appendix, Vol. II, P. 338.

section, means any threat of discharging, any employee for failure to contribute any amount of money for campaign or political purposes or any attempt to force contribution of any amount of money for political or campaign purposes by any influence, or discharging, demoting or reducing the salary or wages of any employee for failure to contribute portions of his salary or wages, or by putting such employee in fear in any manner.

The Registry ordered KEPAC to come into compliance with the Act within 30 days or the violations would be referred "to the appropriate Commonwealth Attorney" in each district where violations are occurring to take such remedial actions as may be hereafter specifically ordered by the Registry.[8]

KEPAC filed an action in the District Court for the Western District of Kentucky, seeking to enjoin the Registry from enforcing its order and requesting the court to declare: (1) the Registry's Findings of Fact, Conclusions of Law, and Order to be unsupported by substantial evidence, and violative of the First and Fourteenth Amendments to the United States Constitution, (2) KRS Chapter 121 to be impermissibly vague and overbroad in violation of the First and Fourteenth Amendments to the United States Constitution, (3) the reverse check-off not to be coercive within the meaning of KRS 121.320 and (4) that boards of education have not rendered a service or other thing of value to KEPAC in violation of KRS 121.015(3).

On November 28, 1977, the District Court issued a Temporary Restraining Order sought by KEPAC.

At the preliminary injunction hearing set for December 7, 1977, Roos and Craig were granted leave to intervene as defendants in the case. Roos and Craig purported to represent a class consisting of teachers contributing to KEPAC. Roos and Craig sought an injunction against the reverse check-off used by KEPAC and a refund of all prior contributions made by the proposed class members to KEPAC.

On January 24, 1978, the District Court granted KEPAC's motion for preliminary injunction and issued findings of fact and conclusions of law as follows:

1. That prior to 1974, KEA had an arrangement with the school boards of Kentucky by which the school boards deducted from K.E.A. members, who were its employees, amounts for dues to KEA various annuities, and insurance premiums. The deductions were made for eight months out of each calendar year and were reflected on the payroll stub of the teachers as the single deduction under the Automatic Payment Authorization Plan.

2. In 1975, the KEA Delegate Assembly attended by 700 delegates, equalling approximately 2.5% of the total membership of KEA, voted to initiate a reverse check-off system for deducting political contributions to KEPAC from the payroll checks of its members. Under the system, members were entitled to refunds of all contributions upon written request.

3. KEA members were advised of the KEPAC check-off system by articles published in KEA News, the official publication of the KEA. These articles advised KEA members of the purposes of KEPAC and their entitlement to refunds of past contributions. Beginning in the school year 1976–1977, applicants for KEA membership were advised in writing of KEPAC's purposes and their entitlement to refunds.

4. KRS 121.320(2) is facially constitutional.

5. There was absolutely no evidence in the record supporting the Registry's conclusion that KEPAC's reverse check-off was coercive within the meaning of KRS 121.320.

6. Inertia of a person to take a step to see that his money is not being used for political purpose, does not deprive him of the right to take that step and cannot be logically interpreted by the Registry as coercion.

7. KRS 121.025 is designed to apply only to private corporations and not to municipal

8. *Id.* at p. 38.

corporations. Therefore, school boards' participation in the reverse check-off is not an unlawful corporate political contribution. KRS 161.158(2) requires school boards to make payroll deductions from teacher's salaries for any lawful purpose when requested to do so by any group of teachers.

8. The Registry applied KRS 121.320(2) to KEPAC in an unconstitutional manner.

9. KEPAC violated the Corrupt Practices Act in failing to register the local political committee established by it.

Simultaneous with the issuance of the preliminary injunction, the District Court overruled Roos' and Craig's motions for certification as class representatives. The Court found that the check-off system in dispute had been created by the KEA Delegate Assembly, and further, that there was no evidence of a class of teachers objecting to the reverse check-off procedure.

On October 24, 1978, the District Court entered an Order granting KEPAC's motion for summary judgment. In so doing the Court distinguished *Federal Election Commission v. National Education Association*, 457 F.Supp. 1102 (D.D.C.1978); *Pipefitters Local 562 v. United States*, 407 U.S. 385, 92 S.Ct. 2247, 33 L.Ed.2d 11 (1972); and *United States v. Boyle*, 482 F.2d 775 (D.C. Cir.1973), on the ground that those cases resolved issues involving the interpretation of federal statutes not relevant to the present action.

The Court reaffirmed its earlier findings that school board employees are advised of the political nature of KEPAC contributions and of their right to refuse to make such contribution; and that no employee is threatened with employment-related or any other penalties for a refusal to contribute. In conclusion, the Court found that KEA members have ample opportunity to exercise their right of dissent by demanding refunds of past KEPAC contributions on the forms furnished members for that purpose.

Subsequently, Roos and Craig moved the Court to amend its summary judgment order and to consider the issue of whether the KEPAC reverse check-off constituted an illegal assessment under KRS 121.320(2).

The Registry had earlier considered this charge against KEPAC and had dismissed it. Appeal was not taken on the dismissal. On December 27, 1978, the Court entered its Amended Summary Judgment in favor of KEPAC. In the Memorandum issued with the Amended Summary Judgment, the Court held that the assessment provisions of KRS 121.320 were intended by the legislature to protect public employees from political extortion. Because neither KEA nor KEPAC could in any way be connected to the employer of Roos and Craig, the Court held that the KEPAC reverse check-off was not violative of the statutory prohibition against assessments. The Court denied KEPAC's claim for damages.

Roos and Craig noted this appeal in a timely manner. Plaintiffs' motion to dismiss the appeal was denied.

The four issues presented on appeal are as follows:

1) Did the district court err in finding that the findings of fact, conclusions of law, and order of the Kentucky Registry of Election Finance were not supported by substantial evidence and that it had applied KRS 121.320 in a manner so as to infringe upon KEPAC's First Amendment rights to collect money for political purposes by use of a reverse check-off?

2) Does reverse check-off payroll deduction procedure for collecting political donations from members of an employee organization that allows the member-employees to elect at the outset not to participate, and which is coupled with a refund system sufficiently protect the rights of dissenting members?

3) Does the reverse check-off procedure result in coerced or assessed political contributions in violation of KRS 121.320?

4) Did the district court err in denying appellants' motion for class certification?

II

The basic issue around which all other questions in this case revolve is whether the reverse check-off procedure with the right of refund is a permissible scheme for politi-

cal fund raising by a voluntary association of government employees. A similar question was faced by the District Court for the District of Columbia in the case of *Federal Election Commission v. National Education Association, supra.* It is useful to examine the thorough and thoughtful reasoning in that opinion. The District Court held that a reverse check-off system by an organization of professional educators in collecting political contributions violated the Federal Election Campaign Act of 1971 where any member who did not wish to contribute had to submit a separate written request for refund rather than disallow its deduction in the first place.

The NEA member automatically agreed to a Political Action Committee contribution when she or he signed the membership application. The District Court relied upon the Supreme Court's decision in *Pipefitter's Local 562 v. United States,* 407 U.S. 385, 92 S.Ct. 2247, 33 L.Ed.2d 11 (1972); *United States v. Bogle,* 482 F.2d 755 (D.C.Cir.1973), *cert. denied,* 414 U.S. 1076, 94 S.Ct. 593, 38 L.Ed.2d 483 (1973), and distinguished *Abood v. Detroit Board of Education,* 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977).

*Pipefitters* involved a conviction of conspiracy under 18 U.S.C. § 371 to violate 18 U.S.C. § 610 which at the time of trial made it illegal for "any labor organization to make a contribution or expenditure in connection with any [federal election, primary or political convention]". Between oral argument and decision, Congress passed the Federal Election Campaign Act of 1971 which added the provision before the District Court in the *NEA* case. The new provision now 2 U.S.C. 441b(b)(3)(A) prohibited the raising of political funds by "dues, fees, or other moneys required as a condition of membership in a labor organization." In *Pipefitters,* the Supreme Court in an opinion by Justice Brennan, held the new provision simply codified existing law. The Court further held the only political contributions by labor organizations that were prohibited were those "actually or effectively required for employment or union membership." *Id.* at 399, 439, 92 S.Ct. at 2256, 2274.

The funds at issue in *Pipefitters* were not assessed dues, but were contributions strictly segregated from the union treasury. The majority of the Court of Appeals for the District of Columbia held that the District Court had erred in not instructing the jury to determine whether the contributions to the separate political fund were voluntary. *Id.* at 435–438, 92 S.Ct. at 2274. To be voluntary the contributions must result from a solicitation that is "conducted under circumstances plainly indicating donations are for political purposes and that those solicited may decline to contribute without loss of job, union membership, or other reprisal." *Id.* at 414, 92 S.Ct. at 2264. In reviewing the legislative history of the restriction on union political activity, the Court cited the words of the Senate sponsor, Senator Taft: "A union can . . . organize something like the PAC, a political organization, and receive direct contributions, just so long as members of the union know what they are contributing to, and the dues which they pay into the union treasury are not used for such purpose." *Id.* at 407, 92 S.Ct. at 2260, quoting from 93 Congressional Record 6439 (1977). "The dominant concern in requiring that contributions be voluntary", the Court said, "was after all, to protect the dissenting . . . union member." *Id.* at 414–415, 92 S.Ct. at 2264.

In *United States v. Boyle, supra,* the Court of Appeals for the District of Columbia reviewed a conviction under the same statute, but as amended by the language of 2 U.S.C. 441b(b)(3)(A). However, the funds at issue in *Boyle* were political contributions made from the union's general treasury constituted of member dues. The Court of Appeals held that the trial court had not erred in omitting an instruction on the voluntary nature of the funds. 482 F.2d at 762.

The *Abood* case involved an "agency shop" arrangement, authorized by Michigan law. Under the arrangement between a local government employer and a union representing local government employees, every employee represented by the union, even though not a union member, was required to pay to the union, as a condition of

employment, a service fee equal in amount to union dues. The question was whether the arrangement violated the constitutional rights of those government employees who objected to the union or to various union activities financed by the compulsory fees. In an opinion by Justice Stewart, the Court upheld the constitutional right of a union to spend funds on behalf of political candidates or toward the advancement of ideological causes, provided that "such expenditures be financed from charges, dues, or assessments paid by employees who do not object to advancing those ideas and who are not coerced into doing so against their will ...". 431 U.S. at 235–236, 97 S.Ct. at 1799.

*Abood*, however, turned on the failure of the objecting teachers to specify their dissent. Without reference to *Pipefitters*, the Court concluded that "dissent was not to be presumed" and that "only employees who have affirmatively made known to the union their opposition ... are entitled to relief ...". *Id.* at 238, 97 S.Ct. at 1801 (quoting *International Ass'n of Machinists v. Street*, 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961)).

In *NEA*, the District Court of the District of Columbia distinguished the case before it from the Memorandum opinion of the trial court in the case at bar granting the preliminary injunction in *Kentucky Educators Public Affairs Council v. Kentucky Registry of Elections*, No. C77–0575 L(A) (W.D.Ky. Jan. 24, 1978). After noting that the Kentucky District Court had approved a reverse check-off procedure, the District of Columbia Court went on to state:

> That decision, however, was not interpreting the same statute as in this case but a comparable state law that prohibited collecting political contributions from members by 'assessment or "coercion".' Moreover, the decision, which was issued in the context of a preliminary injunction and not a final determination on the merits, only said that reverse check-off was not coercive. It expressly reserved judgment as to whether that procedure might nevertheless constitute an assessment, which would be the issue most closely analogous to the one at bar. *Id.* at 1107, footnote 11.

The final judgment by the Kentucky District Court, issued after the opinion in *NEA*, distinguished *NEA* from this case. The District Court stated:

> While [the District Judge's] opinion is very comprehensive and learned, he was dealing with a statute which did not contain the specific language which KRS 121.320(1) and (2) possess as to what constitutes coercion. Furthermore, he was construing a federal statute and the rights of *NEA* under that statute.... *Kentucky Educators Public Affairs Council v. Kentucky Registry of Election Finance, et al.*, No. C 77–0575 L(A) Memorandum opinion of October 24, 1978 at p. 3.

Nonetheless, the fundamental questions in both cases was whether a reverse check-off system meets the "Knowing Free-Service Donation" test set forth in *Pipefitters*. The District of Columbia Court held that a reverse check-off requiring a dissenter to submit a separate written request for refund rather than being able to disallow the deduction in the first place placed an undue burden on the dissenter. The Court below held that a reverse check-off procedure permitting a disallowance in the first place with a right of refund was not coercion and was not an assessment. The decisions are not incompatible, and the court below was correct in its analysis in its decision.

■ The reverse check-off procedure utilized by KEPAC includes a number of safeguards that protect the dissenting member. In the first place, membership in the KEA is not a prerequisite to employment in any of the public education systems of the Commonwealth of Kentucky. Secondly, an educator joining KEA can actively attempt to influence the political and ideological positions of KEA and the political contributions of KEPAC. Thirdly, a KEA member can check-off on the appropriate KEA form to indicate that he or she does not agree to make any contribution to KEPAC for political purposes. Lastly, a KEA member who does not check-off, can ask for a refund. Furthermore, there is nothing in the record to indicate that dissenting KEA members,

i.e.—members who check-off and do not contribute to KEPAC, or who seek refunds, are subject to any recriminations within KEA. To the contrary, the record indicates that KEA members not contributing to KE-PAC have become officers in KEA.[9] Even if *Abood* is not a modification of *Pipefitters,* the KEPAC procedure amply protects the rights of dissenters and meets the tests of *Pipefitters.* (For thorough discussions of theory and practice of protecting dissenting union members, *see* R. Cohan, "Of Politics, Pipefitter, and Section 610: Union Political Contributions in Modern Contest", 51 Texas L. 936, (1973)).

The decision of the District Court is further buttressed by recent decisions of the U. S. Supreme Court protecting the First Amendment rights of corporations to express their views on controversial questions. In *Consolidated Edison Company of New York v. Public Service Commission of New York,* 447 U.S. 530, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980), the Court held that the Court of Appeals of New York properly overruled the finding of the New York Public Service Commission to the effect that a utility company could not properly place inserts in customers' billing envelopes stating the company's position on nuclear energy. The Supreme Court, speaking through an opinion by Justice Powell, stated that a corporation had a right to speak to its customers on controversial issues, and any prohibition of that right by a state agency violated the First Amendment as applied to the states through the Fourteenth Amendment. *Id.* at 544, 100 S.Ct. at 2336.

In *Central Hudson Gas & Electric Corporation v. Public Service Commission of New York,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), a companion case decided the same day, the Supreme Court speaking also through an opinion by Justice Powell held that a ban on utility advertising promoting the use of electricity in the time of fuel shortage, violated the First and Fourteenth Amendments.

These decisions are obviously consistent with *First National Bank of Boston v. Bellotti,* 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978). In that case the Supreme Court declared unconstitutional a Massachusetts statute which prohibited corporations from making any expenditure "for the purpose of . . . influencing or affecting the vote on any questions submitted to the voters, other than one materially affecting any of the property, business or assets of the corporation". *Id.* at 769, 98 S.Ct. at 1412. The Supreme Court found that the interests of dissenting stockholders need not be protected by the state when investment in the corporation is voluntary and the stockholders have not contributed to managements' ideological activities. *Id.* at 794, 98 S.Ct. at 1425. *Bellotti* did not contradict *Pipefitters,* however, as the Supreme Court was careful to note that the protection of dissenters (stockholders or union members), "in the context of partisan candidate elections", is an entirely different matter. *Id.* at 788, 98 S.Ct. at 1422. That proviso coincides with the language of *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam), in which the Supreme Court upheld the constitutionality of the Federal Election Campaign Act's limitations on political contribution. In so doing the Supreme Court declared that the Congress has a legitimate interest in:

> the prevention of corruption and the appearance of corruption spawned by the real or imagined coercive influence of large financial contributions on candidates' position and on their actions if elected to office. *Id.* at 25, 96 S.Ct. at 637.

### III

The district court did not err in finding that there was no substantial evidence to support the findings of fact, conclusions of law, and order of the Kentucky Registry of Election Finance, and in finding that the Registry had applied KRS 121.320 in a manner that violated KEPAC's First Amendment rights to collect money for political purposes by use of a reverse check-off system.

---

**9.** Appendix, Vol. I, p. 173.

■ KEPAC has no constitutional right to a check-off or payroll deduction system for political fund raising, *City of Charlotte v. Local 660, International Association of Firefighters*, 426 U.S. 283, 96 S.Ct. 2036, 48 L.Ed.2d 636 (1976).[10] However, Kentucky law (KRS 161) permits employee organizations to participate in payroll deductions. Considering the KEA and KEPAC had a right to participate in the Automatic Payment Authorization under Kentucky law, the evidence before the Registry does not support a finding of coercion on the part of KEPAC. The Registry found that the reverse check-off system was coercive as a matter of law and without any factual underpinning. The record below indicates that the opinion of one school superintendent was the only factual basis for the Registry's finding of fact. (Appendix pp. 272–274). The conclusion of law by the Registry that the reverse check-off is coercive was not supported by any legal precedent, but was apparently based upon the Registry's inability to find any authority for it. (*See* Appendix at 220).

## IV

The reverse check-off system coupled with the refund procedure as utilized by KEPAC does not violate the rights of dissenting members of KEA.

As stated earlier in this opinion, the members of KEA have four avenues of dissent; they can leave KEA without jeopardizing their employment; they can remain in KEA and work to influence its ideological and political positions; they can check-off and refuse to make donations to KEPAC; failing to check-off, they can request and receive refunds of KEPAC donations.

These avenues of dissent are adequate to protect the rights of dissenting members as defined by *Pipefitters*.

*Amicus* argues that the fact that a KEA member might ignore the various information about the check-off and the right of

refund and make an inadvertent or unintentional contribution to KEPAC is sufficient to establish the procedure as coercive. This argument might prevail in unusual circumstances such as an organization of unlettered employees attempting to use a reverse check-off system, but that is not the situation that is before us.

## V

The district court found that the reverse check-off system is not coercive because there was no threat of discharge for not contributing.[11] The Court was correct. KRS 121.320 in pertinent part reads as follows:

> The term 'coercion' as used in this section, means any threat of discharging any employee for failure to contribute any amount of money for political or campaign purposes or any attempt to force contributions of any amount of money for political or campaign purposes by any influence, or discharging, demoting or reducing the salary or wages of any employee for failure to contribute portions of his salary or wages, or by putting such employee in fear in any manner.

There is not a shred of evidence in the record to indicate that the employment of any KEA member was jeopardized or appeared to be jeopardized by failure to contribute to KEPAC. The intervening defendants, KEA members, do not claim that their employment was jeopardized. Membership in KEA is not a prerequisite for employment by any school system in Kentucky. There is nothing in the record to indicate that any school board in Kentucky took notice of which KEA members contributed to KEPAC or which members failed to contribute to KEPAC. There is absolutely no correlation between employment, promotions, demotions, or discharge of any employee of any Kentucky School System and donation or nondonation to KEPAC.

■■ The next question is whether the reverse check-off system constituted an as-

---

**10.** The Supreme Court upheld the right of the City of Charlotte to refuse to deduct union dues from the payroll of firefighters union members in the absence of law or so long as the city did not act in arbitrary manner.

**11.** Memorandum Opinion of October 24, 1978. Appendix Vol. I, pp. 110–114.

sessed political contribution in violation of KRS 121.320. The pertinent portions of the statute defines "assessment" as:

> . . . the fixing of any amount, to be given in money by any employee, and the soliciting of that amount or any amount in money from a person so assessed.

The Registry considered this question and found that the reverse check-off was not an assessment. The District Court agrees. 26 Am.Jur.2d Elections, Sec. 288:

> A corrupt practices act is penal in nature and should be strictly construed. The construction of such a statute must be reasonable and should be such as to effectuate the intention of the legislature, but the statute can be given no broader application than is warranted by its plain and unambiguous terms.

The District Court then interpreted decisions of Kentucky courts as mandating strict construction of the Kentucky Corrupt Practices Act, citing *Withrow v. Willis*, 447 S.W.2d 627 (Ky.1969), and quoting the Kentucky Supreme Court in *Riddle v. Eaton*, 447 S.W.2d 47 (Ky.1969):

> One of the purposes of KRS 123.030 (the forerunner of KRS 121.320) is to prevent coerced contributions from a person who may be under the dominion or control of a candidate for office. *It is primarily for the protection of the employee.* (Appendix at 141, Emphasis added by the District Court).

The appellee, KEPAC, had urged the District Court to find the statute unconstitutionally broad and vague. The appellants, Craig and Roos, had urged the court to stretch the plain meaning of the statute to bar all solicitations of political contributions from public employees. The court properly rejected both arguments.

## VI

KEPAC insists that Roos and Craig have no standing to raise the issue of the assessment question as they did not make an objection below to the finding of the Registry that the reverse check-off is not an assessment. Since we agree with the finding of the Registry and of the District

Court, it is not necessary to address that question of standing.

Roos and Craig also argue that a Kentucky board of education is a corporation under that state's Corrupt Practices Act and that as such it cannot participate in a payroll deduction that includes a donation to a political action committee. That was the finding of the Registry but was correctly rejected by the District Court in reliance upon *Kerr v. City of Louisville*, 271 Ky. 335, 111 S.W.2d 1046 (1938).

The District Court did not abuse its discretion in denying class certification.

This Court has held that district courts have broad discretion in deciding whether an action may be maintained as a class action. *Ott v. Speedwriting Publishing Company*, 518 F.2d 1143 (6th Cir. 1975).

The United States Supreme Court has held that members suing a union for using dues funds for political purposes were not entitled to class certification when none of the proposed class had specifically objected to the challenged use of dues. *International Association of Machinists v. Street*, 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961). The Supreme Court bottomed its reasoning on the question of remedy:

> [relief] would properly be granted only to employees who have made known to the union official that they do not desire their funds to be used for political causes which they object. . . . [D]issent is not to be presumed, it must affirmatively be made known to the union by the dissenting employee. The union . . . should not in fairness be subjected to sanctions in favor of an employee who makes no complaint. . . . From these considerations, it follows that the present action is not a true class action, for there is no attempt to prove the existence of a class of workers who had specifically objected to the inaction of dues for political purposes. *Id.* at 774, 81 S.Ct. at 1802.

The District Court in relying upon *Street* found that:

> [w]hile it may be that many of the 23,000 members of the KEA are opposed to the reverse check-off method there is no showing that they have taken any steps

at this stage of the proceedings to specifically object to such a method, except for the two intervening petitioners.

 As the record reflects that the requirements of Rule 23(a) of the Federal Rules of Civil Procedure were not met by the intervening defendants petitioning for class certification, we conclude that the District Court properly denied such certification.

Since this appeal was filed and heard, it has been brought to our attention that the issue of the legality under the Kentucky constitution of payroll deductions for political purposes has been presented in the state courts of Kentucky. That question is not before us in this case. It will not be considered. The parties make no claims under the doctrines of abstention or res judicata that the District Court should have deferred to state proceedings or was barred from reconsideration of the state administrative decision. We do not address issues related to those doctrines.

In accordance with the reasoning set out above, the judgment of the District Court is affirmed.